## COOPER ET AL. *v.* COOPER ET AL.

[No. 16,999.   Filed November 2, 1943.   Rehearing denied
December 2, 1943.   Transfer denied December 24, 1943.]

262

*McClure & Shenk,* of Kokomo, and *O'Bear & O'Bear,* of Delphi, for appellants.

*Robert K. Ryan* and *Robison & Robison,* all of Frankfort, and *Cartwright, Wason & Ives,* of Delphi, for appellees.

DRAPER, J.—This is an action brought by the appellees against the appellants to invalidate and set aside the probate of the last will and testament of John W. Cooper, the complaint alleging that at the time of the execution of the will the testator was of unsound mind, that the will was unduly executed, was executed under duress and was obtained by fraud.

The jury returned a general verdict for the appellees and by its answers to interrogatories propounded at the request of the appellants, without objection by the appellees, indicated that its verdict was based on a finding that the execution of the will was procured by undue influence, and at appellants' insistence we shall assume that the answers to the interrogatories, in the form in which they were submitted, do eliminate all other issues, although we do not decide the question, it being unnecessary to do so.

The appellants complain that the verdict of the jury is not sustained by sufficient evidence and is contrary to law, of error in the giving and refusal to give certain instructions, of the admission of a certain deposition and of the admission of certain testimony.

The testator, a practicing physician about fifty years of age and the father of several children was divorced

in 1909 and about three weeks later was married to the appellant Ethel Cooper, hereinafter referred to as the appellant, then in her early twenties. About ten years after the marriage they removed to Indianapolis where he established a practice and the appellant remained there with him about two years, after which he continued to live and practice there, commuting weekly to a farm to which she had moved and where she lived and which she managed. On March 31, 1931, he went to an attorney in Tipton who prepared the will in question and mailed it to the deceased at Indianapolis. On the 20th day of the following month he brought the will to the appellant bank at Tipton, where at his request it was witnessed by two officers of the bank and left with the bank for safe-keeping. He died on January 23, 1939, and on January 28, 1939, the appellant asked the attorney whether the testator had left a will and the latter, having forgotten that he had prepared the will, assisted her in the preparation of an application for letters of administration. On June 3, 1939, following a routine check the will in question was discovered in the bank by its officials and its existence made known. By the terms of the will certain real estate was left to the appellant, who is a childless second wife, together with the greater portion of his personal property. Other real estate was left in trust to be operated and managed by a trustee, the profits therefrom to be divided annually between the two surviving sons or their wives and upon the death of both sons and their wives, then to the testator's grandchildren then surviving.

The evidence most favorable to the appellees on the question of undue influence would indicate that the appellant, over the period of their married life, had obtained nearly everything of which the deceased was

possessed. This she did, insofar as the real estate was concerned, by acquiring the title in her own name or having it put in both, by entireties; some being thus secured before the making of the will and some, including some of that devised to the appellees, after the making thereof, so that the latter was removed from the operation of the will. This she accomplished in part by persistent and long continued pressure taking the form of threats to leave the deceased, break up the family relationship and live apart from him unless he acceded to her demands. In connection with one farm she commenced on him, as she admitted to one of the witnesses, and worked on him for six weeks to sign the place over to her. She threatened to leave him unless he did so, and in fact did leave him and go to New York, finally winding up in Chicago, to which city he came and it was two days and two nights before he would give up and sign over. She said that he walked the floor like a crazy man but she just stayed with it until she made him sign the place over. She added that she had everything under her thumb; that she could make him give her money for anything she wanted; that anything she wanted she would make him dish it out to her; that she had him right where she could do as she pleased. She frequently absented herself for rather long periods, sometimes without advising him of her whereabouts, and this fact, coupled with the fact that he suspected her motives in making such excursions, kept him in a state of despondency. She made visits to New York to study voice and to induce her to give this up he turned over to her the management of his farms, which she thereafter ran as she pleased, he having little, if any, voice in the operation or management of them. He was thereafter worried about the manner of the operation of the farms and the finan-

cial situation as it pertained to them, but dared not try to deprive her of their management. He was unhappy and dissatisfied with the kind of life he was compelled to live—cooking for himself and eating any way he could—but could not change the situation and considered "ending it all." He could neither induce nor compel the appellant to disassociate herself from women companions whom he considered of questionable character, and when asked why he didn't leave her, answered, "I can't." He learned and disapproved of, yet endured, conduct on her part which men possessed of free minds consistently refuse to tolerate. He was not free from fear of bodily injury at her hands and on at least one occasion when he remonstrated with her about permitting a certain upholsterer to stay with them and asked her to send him away, she seized him by the throat, choked him and threw him to the floor. He had not the physical strength with which to defend himself and sought temporary refuge with one of his sons—but the upholsterer remained. There is evidence that they talked about the will—that she made it out—that she fixed it and he took it in. The judges of this court are not of one mind as to the strength or weakness of the case made by the appellees but all are agreed, after a painstaking examination and consideration of these and other facts appearing in evidence that there is ample evidence to support a finding that the deceased was unduly influenced and dominated by the appellant.

The appellant insists, however, that to render a will void, undue influence must be directly connected with the execution of it and must operate at the time it is made, and she calls our attention to the fact that the will in question was made while the testator was alone in the lawyer's office when its provisions were considered and that it was made about eight years before his

death and remained unchanged when he died. It is said in *Wiley et al.* v. *Gordon et al.* (1914), 181 Ind. 252, 266, 104 N. E. 500, that: "Undue influence, in order to make a will void, must be directly connected with its execution and must operate at the time it is made. It must be an influence of such compelling force that the apparent testator is but the instrument by which the mastering desire of another is expressed, so that the supposed will, or the particular part in question, is not the will of the testator except in the sense that he has consented to put his name to it in the form in which it appears." See also *Beaver et al.* v. *Emry et al.* (1926), 84 Ind. App. 581, 149 N. E. 730. In *Crane et al.* v. *Hensler et al.* (1925), 196 Ind. 341, 354, 141 N. E. 51, 146 N. E. 577, 148 N. E. 409, the following language appears: "The undue influence that will vitiate a will must be such as to destroy, in some degree, the free agency of the testator and constrain him to do what is against his will, but what he is unable to refuse, or is too weak to resist . . . . And it must be directly connected with the execution of the will and operate at the time it is made with such compelling force that the apparent testator is only the instrument by which the overmastering desire of another is expressed."

While it is true as above stated that undue influence, in order to make a will void, must be directly connected with its execution and must operate at the time it is made, it is also true that it is not necessary, in order to vitiate a will because of undue influence, that the one having the influence over another should be actually present and exercising it at the time and place of the preparation and execution of the will. If an undue influence previously acquired still persists at the time of the execution of the will, so that but for it the will would have been different from that

actually executed, that undue influence vitiates the will. *In the matter of the Estate of Mary E. Newhall, sometimes known as M. E. Newhall, Deceased* (1923), 190 Cal. 709, 214 P. 231, 28 A. L. R. 778. So it was, in our opinion, in this case. From the evidence it appears to us that the undue influence of the appellant over the testator was a continuing and controlling influence, commencing a comparatively short time after their marriage and continuing until the death of the testator, and, therefore, necessarily existing at the time of and directly connected with the preparation and execution of the will. Such influence continuing, as it did, until the death of the testator, it is unnecessary to decide whether a will so executed may be ratified by the testator by recognizing it as in effect after the undue influence has been removed.

The appellant suggests that in the consideration of this question the appellant, as the wife of the testator, occupies a favored position in the law, and it is true that relations arising out of affection and confidence existing between the testator and his wife would constitute no evidence that she exerted an undue influence which induced him to make a will which he otherwise would not have made. The influences which arise from the social and family relations are not undue or unlawful, and the influence of the husband over the wife or the wife over the husband are legitimate influences which should always exist and be encouraged, and should never be confounded with positive dictation and control exercised over the mind of the testator. Destruction of the free agency of a testator may be accomplished by persuasion, importunities, force, threats or coercion of such character and degree that they cannot be resisted. *Bundy* v. *McKnight, Executor, et al.* (1874), 48 Ind. 502, 516. It involves a state of

mind, and may be brought about by either mental or physical coercion, fear, a desire for peace or a feeling which one is unable to resist. *Workman* v. *Workman* (1943), 113 Ind. App. 245, 46 N. E. (2d) 718. It is our opinion that the evidence above detailed could hardly be construed as exhibiting an influence springing from love, affection, or kind and considerate treatment, or as springing in any way from any initimate family relationship, and in such a situation, the wife occupies no better position than does a stranger.

Several instructions tendered by the appellees and given by the court were objected to for the asserted reason that there was no competent evidence in the cause supporting the issue of undue influence, and one tendered by the appellant and refused by the court would have taken the issue of undue influence from the jury for the same reason. What has already been said indicates that the ruling of the court was right in each instance.

Instruction 10 given by the court has to do only with the determination of the question of unsoundness of mind. We are of the opinion that it is not subject to the criticism leveled at it, but in any event it could not have been harmful to the appellant since this issue was determined in her favor.

The deposition of one witness was admitted and read in evidence, and when it was offered the appellant objected generally "to the deposition and each question therein and each answer thereto, for the reason the witness does not testify as to any facts touching the execution of this will or as to any facts on which he could base an opinion as to unsoundness of mind or any facts on which he could establish undue influence in the execution of this will." In our opinion the objection as made was ineffective to raise

any question. The statute (§ 2-1521, Burns' 1933) provides that objections to the propriety of any questions proposed to or answers given by a deponent may be made at the time of taking his deposition, or in court, whether made at the taking of the deposition or not. This means that such objections may be made when it is offered *and as it is offered,* the same as if the witness were upon the stand before the court and jury. *Pence et al.* v. *Waugh et al.* (1893) 135 Ind. 143, 34 N. E. 860. A trial court can hardly be expected to rule intelligently as to each question and answer in a deposition in response to a general objection made as in this case, nor on a motion for new trial when such an objection is merely set out therein as made, without particular reference to any question put or answer made. If by this objection the appellant sought to eliminate the entire deposition by bringing herself within the provisions of § 2-1522, Burns' 1933, it was ineffective for that purpose for the reason that it was not timely made. Whether it was ineffective under the last mentioned statute for other reasons is not considered.

It is lastly contended that the court erred in permitting several winesses to testify to conversations and declarations of the testator at times remote from the time of the execution of the will. However, in not a single instance does the appellant in her motion for new trial set out any objection made to any question which elicited such testimony, and therefore, no question is presented. *Greer* v. *State of Indiana* (1929), 201 Ind. 386, 168 N. E. 581; *Moorman Manufacturing Company* v. *Keller* (1934), 98 Ind. App. 607, 184 N. E. 913.

Finding no error, the judgment is affirmed.

NOTE.—Reported in 51 N. E. (2d) 100.