101 Ariz. 8 (1966)
415 P.2d 431
In the Matter of the ESTATE of Bond Sneed McCAULEY, Deceased.
Cleyburn Faris McCAULEY, Appellant,
v.
Arthur TALK, Jr., and Lillian Denson, Appellees.
No. 7303.
Supreme Court of Arizona. In Banc.
May 11, 1966.
*9 Donald B. Shortridge, Phoenix, James A. Quisenberry, Erie, Pa., for appellant.
Snell & Wilmer, Phoenix, for appellees.
LOCKWOOD, Justice:
In this will contest, proponent, Cleyburn Faris McCauley, appeals from the order of the trial court refusing to admit to probate a document purporting to be the last will and testament of Bond Sneed McCauley, deceased. Upon notice of proponent's offer in probate of the purported *10 will, contestants, Arthur Talk, Jr. and Lillian Denson, by their respective fathers as guardians ad litem, filed with the Court their petition opposing probate of the will. Thereafter, the matter proceeded as a "Contest of Will Before Probate" pursuant to A.R.S. §§ 14-351 to 14-356.
The matter was tried before the Court, sitting without a jury. Proponent did not attend the trial in person. Thereafter, the Court which made extensive findings of fact and conclusions of law, found that the purported will was procured by the fraudulent representations and undue influence of the proponent, and entered judgment in favor of contestants.
Decedent died in Phoenix on October 21, 1959. She had married proponent on October 28, 1957. Decedent had been married twice before her marriage to proponent, each of the former marriages ending in divorce. Contestant Arthur Talk, Jr. was born as the issue of the marriage of decedent and Arthur Talk, Sr. Contestant Lillian Denson was born as the issue of the marriage of decedent and Vernon Denson. The purported will names proponent as independent executor without bond and, after leaving him specific items such as household furnishings and personal effects, bequeaths and devises the rest and residue of testatrix' estate as follows: an undivided one-half to contestants, share and share alike, and the other remaining undivided one-half to proponent. The will in question was executed on November 18, 1958, while decedent was hospitalized.
Proponent's third and fourth assignments of error question the sufficiency of the evidence to sustain the Court's finding that proponent unduly influenced decedent to execute the purported will. In particular, proponent urges that the evidence is insufficient to show that he was active in procuring the execution of the will or that decedent's will was overpowered so that proponent could make her wishes and desires conform to his own.
The basic concept emerging from the mass of decisions on the subject of undue influence is that a person unduly influences a testator or testatrix in executing a will when that person through his power over the mind of the testator or testatrix makes the latter's desires conform to his own, thereby overmastering the volition of testator or testatrix. In re Reddaway's Estate, 214 Or. 410, 329 P.2d 886 (1958); In re Blake's Will, 21 N.J. 50, 120 A.2d 745 (1956); In re Jennings' Estate, 335 Mich. 241, 55 N.W.2d 812 (1952). See generally, 1 Page, Wills §§ 15.1 to 15.3 (Bowe-Parker edition, 1960); 6 Powell, Real Property ¶ 948 (1958). Since undue influence is commonly exercised in secret, it may be established by circumstantial evidence. In re Westfall's Estate, 74 Ariz. 181, 185, 245 P.2d 951, 954 (1952). Whether undue influence has been exerted to bring about the making of a particular will is a question of fact. See In re Urich's Estate, 194 Or. 429, 242 P.2d 204 (1952). The burden of proving that a will has been procured by undue influence is on the contestant. In re Westfall's Estate, 74 Ariz. 181, 245 P.2d 951 (1952).
In determining whether a contestant has established that a will has been procured through undue influence, certain factors have been treated as significant indicia of the presence or absence of such influence. See In re Reddaway's Estate, supra; 6 Powell, Real Property, supra. These factors include the following: Whether the alleged influencer has made fraudulent representations to the testatrix;[1] whether the execution of the will was the product of hasty action;[2] whether the execution of the will was concealed from others;[3] whether the person benefited by the will was active in securing its drafting *11 and execution;[4] whether the will as drawn was consistent or inconsistent with prior declarations and plannings of the testatrix;[5] whether the will was reasonable rather than unnatural in view of the testatrix' circumstances, attitudes, and family;[6] whether the testatrix was a person susceptible to undue influence;[7] and whether the testatrix and the beneficiary have been in a confidential relationship.[8] Some confidential relationships in conjunction with other basic facts, such as proponent's activity in procuring the execution of the will and his being named as its principal beneficiary, give rise to a presumption of undue influence. In re Pitt's Estate, 88 Ariz. 312, 356 P.2d 408 (1960); In re O'Connor's Estate, 74 Ariz. 248, 246 P.2d 1063 (1952).[9] The parties have suggested in their briefs that the presumption of undue influence is involved in this case. But the marital relationship existing between testatrix and proponent is not one of the confidential relationships giving rise to the presumption of undue influence. Craig v. Lamoureaux, [1920] A.C. 349 (P.C., Can. 1919); In re Livingston's Will, 5 N.J. 65, 73 A.2d 916 (1950). Accordingly, here the burden of proving undue influence remained with the contestants.
However, proponent's marriage to testatrix does not completely insulate him from a possible finding that he unduly influenced his spouse in executing her will. See Estate of Teel, 25 Cal.2d 520, 154 P.2d 384 (1944); Taylor v. Taylor, 248 S.W.2d 820 (Tex.Ct.Civ.App. 1952).
Where the contestant has presented evidence from which a reasonable person could conclude that the person charged with exerting undue influence had a disposition to exercise such influence, that he had an opportunity to exercise undue influence, that some influence was exerted, and that the will seems to result from such influence, a question of fact is presented. In re Roehl's Will, 261 Wis. 466, 53 N.W.2d 180 (1952).
Although none of the enumerated factors standing alone or even in combination with some others, may be sufficient to sustain a finding of undue influence,[10] the force of the combination of all these factors may be sufficient to raise a question of fact as to the existence of undue influence. In re Burton's Estate, 45 So.2d 873, 875-876 (Fla. 1950); In re Reddaway's Estate, 214 Or. 410, 329 P.2d 886 (1958).
*12 It therefore becomes important to analyze the evidence relied upon by contestants and questioned by proponents to determine whether, in accordance with the foregoing principles, it is sufficient to sustain the trial court's finding that the purported will was procured by the undue influence of proponent.
Fraudulent Representations
In the late summer of 1956 proponent lived in Enid, Oklahoma, with his third wife, Mrs. Leona McCauley, and his two children. He was then self-employed in the advertising business. When this business failed shortly thereafter, leaving proponent in debt by $1,000, he became "panicky" and moved to Houston, Texas, "to get started again."
While proponent was in Houston, he met decedent in November of 1956. Shortly after their meeting proponent prevailed upon her to loan him $750. Thereafter, they did not see each other until March, 1957, at which time proponent falsely represented to decedent that he was separated from his wife and had been so separated for some time before he went to Houston. In fact, he made frequent trips to Enid during this period of time and during these visits his marital relationship with his wife was normal.
By 1956 decedent had decided to institute action to obtain a divorce from her second husband, Vernon Denson. As a result of the divorce proceeding and the property settlement incident thereto, an irrevocable trust was established, naming decedent as an income beneficiary to the extent of $2,000 per month tax free during her life, and upon her death, to her children in equal shares upon each reaching the age of thirty.
Within two weeks of her divorce decedent began to see proponent frequently. By early April, 1957, decedent had cosigned a $1,000 note with proponent for his benefit.
On or about May 1, 1957, proponent, through decedent, attempted to sell a real estate note to the trust; the principal balance due on the note was $7,100 and proponent offered to sell the note for $7,000. The real estate note was then subject to a $2,500 discount, but proponent informed neither decedent nor the trustees of this discount. Proponent was to receive $1,000 from the owner of the note for selling it to decedent's trust. Upon decedent's presenting the note to Mr. Simmer, one of the trustees, and Simmer's expressing a desire to inquire about the note further, proponent demanded that the note be returned to him immediately. Decedent then wrote to Mr. Simmer stating that there was no strong feeling between herself and proponent and requesting Mr. Simmer not "to discuss it with any of the other trustees. It would only get back to my family and get them upset and for no cause since I did not get involved in it."
Sometime in May, 1957, decedent moved from her mother's home into an apartment. Proponent then began visiting decedent at her apartment, spending most of the day and evening there.
In mid-July, 1957, decedent wrote to Mr. Simmer, requesting that the trustees authorize her purchase of a new car. At first, the trustees acceded to this request. However, when the trustees learned that decedent was not trading in her 1955 Oldsmobile on the purchase price of a 1958 model car but was planning to sell her Oldsmobile to proponent for $100, the price proponent had told decedent she would get for her car on a trade-in, they refused to authorize the purchase. In September, 1957, proponent traded in decedent's 1955 Oldsmobile for $2,000 toward the purchase price of a car purchased in his name.
Shortly thereafter, proponent convinced decedent that the trust res would be dissipated by the trustees and her ex-husbands, thus persuading decedent to consult an attorney to attempt to revoke the trust.
During the summer of 1957 proponent experienced an apparent seizure, during which he represented to decedent that he was a messenger to her from somebody in *13 Heaven. Mrs. Lupear, an old friend of decedent's testified that decedent had confided to her that she, decedent, believed in communications from spirits.
Decedent continued living in her Houston apartment until August 13th or 14th, 1957. At that time she discharged her servants who had been with her for six years, telling them that she could no longer afford to pay them. Prior to that time decedent had never indicated to her servants that she was lacking in money to pay them or to run her household. Decedent appeared to be dazed on this occasion and also appeared to be sorry to see her servants leave. Proponent admitted that he had suggested to decedent that she get rid of these servants because they were costing too much
On August 15, 1957, proponent went to San Antonio, Texas to see his friend, Anton G. Choban, who was moving from San Antonio to San Marcos on that day. Proponent told Choban that he was doing his best to help decedent to revoke her trust and promised Choban that if he would give proponent and decedent shelter in Choban's home, Choban would have a lifetime income once decedent regained control of her wealth. In return for this promise, Choban permitted decedent, proponent, and Lillian, decedent's daughter, to move into his San Marcos home on August 15th or 16th. Shortly after moving into this home proponent arranged for decedent to purchase Choban's equity in a home in Houston for a $1,000 down payment, which was to be Choban's "immediate relief," plus a $3,000 note made by decedent. Proponent then asked Choban to make additions and improvements to the San Marcos home. When Choban asked how these changes were to be financed, proponent told Choban to make decedent think that proponent was handling her affairs properly so that the improvements could be made with decedent's money while she would be led to believe that the payments were being used to discharge her indebtedness to Choban. However, proponent assured Choban that he and Choban had a side agreement, unknown to decedent, so that these payments would not be credited against decedent's indebtedness to Choban and that Choban would eventually be paid the full value of the note.
In September, 1957, decedent instituted action to revoke the trust. The decision on this action was adverse to decedent. McCauley v. Simmer, 336 S.W.2d 872 (Tex. Ct.Civ.App. 1960). On October 28, 1957, proponent obtained a divorce from his former wife, Mrs. Leona McCauley. On the same day proponent and decedent were married. Because of proponent's and decedent's cohabitation in the presence of her daughter, Lillian, prior to their marriage, decedent's second husband brought a successful habeas corpus action in 1958 to obtain custody of his daughter, Lillian. Proponent later falsely represented to decedent that her mother had bribed the judge and jury to decide the custody case adversely to her. Proponent also falsely told decedent that her step-father had stolen the inheritance she was to receive from her grandmother and natural father.
The evidence related above was sufficient to warrant the trial court in finding that proponent made such fraudulent representations to decedent. By the means of these representations proponent attempted to obtain control over decedent and to alienate decedent from her family, friends, and the trustees she had chosen to manage her property, in order to supplant her confidence in these people and promote his own advantage.[11] The trial court in its findings of fact found that this pattern of continuing fraudulent representations evidenced a preconceived, deliberate and continuing scheme, device, plan and artifice, by proponent to acquire, alienate and dissipate decedent's estate with complete disregard to the minor son and daughter of decedent. *14 His finding in this respect is not "clearly erroneous" and thus cannot be set aside. Rule 52(a), Rules of Civil Procedure, 16 A.R.S.
Will Product of Hasty Action
Attorney Theodore Kirchheimer testified that decedent called him from the hospital shortly before the will was signed and asked him to draw a will. Kirchheimer said that he suggested that decedent have another attorney, Mr. Atkinson, who had introduced Kirchheimer to the McCauleys, draw the will. On the same day decedent called Mr. Atkinson with regard to his preparing a will. Atkinson never visited the hospital to confer with decedent about the provisions of the will, although he had visited decedent there with regard to other matters. He testified that decedent gave him over the telephone the outline of the will, to which she later made minor changes. When decedent indicated her satisfaction with the final draft, Atkinson instructed Mrs. Fuller, Kirchheimer's secretary, to take the will to the hospital to have it executed. The execution was accomplished in the afternoon of November 18, 1958 in approximately ten minutes.
Significantly, Atkinson testified that in his conversations with decedent with regard to the will he did not discuss with her the extent of her property either in or outside the trust, whether she had ever executed any prior wills, the ages of her children and that if she were to die while they were minors, leaving property to them outright, guardians would have to be appointed for them, or that, because her children were minors, she should consider setting up a trust to protect the property she was leaving them, even though decedent on prior occasions had told Atkinson that she desired to set up another trust for her children if she could revoke her present trust.
It is also significant that both Atkinson and proponent learned, shortly before the preparation of the will, that decedent had a serious kidney disease.
Execution of Will Concealed
Following the execution of the will, it was placed in Kirchheimer's office safe from which it was eventually released to proponent on one of his trips to Houston after he and decedent had moved to Phoenix.
The only people who had any knowledge that decedent had executed the will were the two witnesses, (neither of whom knew her prior to the execution of the will), Mrs. Fuller, Mr. Atkinson, Mr. Kirchheimer, and proponent. Neither decedent's mother nor her two children, all of whom were living in Houston, were informed that decedent had executed a will.
Activity in Procuring Drafting and Execution of Will
From substantial evidence the following facts are established: Proponent obtained from decedent a holographic will early in 1958 leaving him half of her property. He was advised by his lawyers that the holographic will was not worth the paper it was written on. Proponent and decedent subsequently discussed the terms of the will currently in question prior to execution. Proponent called on Atkinson prior to the execution of the will, told Atkinson that he and decedent had discussed the terms of the will, and told Atkinson to draft a will in accordance with those terms as related to Atkinson by decedent. Atkinson read the terms of the will to proponent after the will had been drafted but prior to its execution. Proponent was told to absent himself from the hospital at the time of execution. Proponent inquired about a will to leave him all of decedent's property, although he was informed by Atkinson that such a will probably would not withstand contest. Atkinson and proponent discussed the probable validity of the will in question as against contest and concluded that such a will had a better chance of success than a will leaving all of decedent's property to proponent. These facts are sufficient for the court to find an active participation in procuring the *15 drafting and execution of the will in question.
Inconsistency of Will with Other Plannings and Declarations
Prior to the drafting of the will in question, decedent in 1944, 1947, and 1955 had had Mr. Platt, an attorney who had known her since childhood, draft wills for her. Each of these prior wills contained elaborate trust provisions for her minor children upon her death. The will in question, however, contains no such trust provisions for her children, although, as noted, she had mentioned such a trust to Mr. Atkinson on several occasions prior to the preparation of this will. The 1944 will leaves no property to decedent's former husband, Arthur Talk, Sr., although decedent and Talk were not divorced until 1946. Decedent's 1955 will left no property to Vernon Denson from whom decedent was at that time separated.
Decedent's avowed purpose, repeatedly expressed by her, in setting up the inter vivos, irrevocable, spendthrift trust incident to her divorce from Denson was to avoid any repetitions of the marital difficulties and property settlements she had experienced in the past. She wished to insure that any man who was attracted to her in the future would be attracted solely by reason of affection and love and not by attraction to her money. Decedent stated her reasons for establishing the trust in a letter written within a few days after her divorce from Denson as follows:
"I did it because I don't want to have to go through any more property settlements with any  if any  future husbands. I also did not want my children to be subjected to what I have experienced in the past."
Within a month or two after the execution of the will in question, proponent and decedent visited her friend, Mrs. Lupear. While there, decedent informed Mrs. Lupear that she had mentioned Mrs. Lupear's daughter, decedent's godchild, in her will. Her will, executed in 1955 does provide for a gift to Mrs. Lupear to be used for Mrs. Lupear's daughter, but the will in question makes no such provision. Decedent then turned to proponent and said to him, "`You know I can't leave you anything.'"
In letters written by decedent to her children in 1959 decedent explained that her purpose in setting up her inter vivos trust was "to protect the three of us." She indicated that her purpose in bringing suit to revoke the trust was to "save" her property for her children.
In contrast to these declarations of decedent's purpose, ante-dating and postdating the execution of the will, the purported will leaves one-half of the residue of decedent's estate to proponent, and attempts, in so far as the will would be legally effective to do so, to revoke her inter vivos trust and to authorize proponent to continue litigation to revoke that trust, without providing for a substitute trust for her children. Viewed from the vantage point of the time of execution, this will, if the directions to revoke the trust were effective, would have devised and bequeathed one-half of decedent's large fortune, including the property which was in her trust, to proponent. This pattern of distribution would be entirely inconsistent with decedent's oft-repeated purpose to exclude husbands  including proponent  from sharing in her property and to preserve that property for her minor children. If the will in question were to be admitted to probate, only the decision adverse to proponent in the trust litigation would prevent him from taking one-half of the trust property that decedent was attempting to "save" for her minor children.
"Reasonableness" or "Unnaturalness" of Will
To minimize confusion in the usage of the ambiguous terms "unnatural" and "reasonable", we quote the following passages which give content to these terms:
"Respondents also make much of the contention that the will constituted what *16 they claim is an `unnatural disposition' of decedent's property as supporting the idea that the will was procured by undue influence. That depends a good deal upon the interpretation placed upon the words `unnatural disposition.' `In a legal sense a will is unnatural only when contrary to what could be expected of the particular individual in question, considering the type of man he was as manifested by his views, his feelings, his intentions and the like. When natural by this test, it cannot be said to be unnatural in the legal sense, however much it may differ in his dispositions from those ordinary men make in similar circumstances.' [Citing cases]" In re Lavelle's Estate, 122 Utah 253, 265, 248 P.2d 372, 378 (1952)
"Of course, the will here disregarded to a great extent the testator's heirs at law, that is, his brother and the two children of his deceased sister, and left the bulk of his estate to one wholly unrelated to him. If the jury found that such a disposition was unjust and unreasonable, then that disposition would be circumstantial evidence tending to prove undue influence. * * * Whether the disposition was unjust and unreasonable was a question of fact for the jury and depended to a considerable extent on what the jury found, from the evidence, was the testator's true relationship with, and feeling toward, his heirs at law, on the one hand, and [the proponent] on the other hand." Lancaster v. Bank of New York, 147 Conn. 566, 574, 164 A.2d 392, 396 (1960).
Thus, the question whether this will is "unnatural" or "unreasonable" entails a subjective rather than an objective test. That is to say, based upon what is known of this particular testatrix, does the will in question represent the type of will which one would expect her to execute?
Relevant here is the evidence to the effect that decedent had shown a fixed intention to leave her property in trust for her children and to exclude her husbands from taking her property. Another unusual feature of this will is that it names proponent as sole independent executor, whereas in each of decedent's prior wills she had provided for multiple executors and trustees and also provided for the replacement of any such executor or trustee who became unable to act. One other unusual feature of this will can be noted, namely, that testatrix should attempt to dispose of her large estate in a will containing only a page and a half of simple provisions as contrasted to her prior wills which attempted to dispose of this estate in very complex and carefully considered provisions, being respectively eight, eleven, and thirteen pages in length.
Based on these facts, the trial court could properly conclude that the will in question is not the type of will which one would expect this particular testatrix to execute.
Was Decedent a Person Susceptible to Undue Influence
Witness George Hill testified that decedent from the time he knew her when the two of them were classmates in grade school was imprudent with men. Hill testified that decedent's weakness in this respect was founded in large part on the fact that as a child decedent was a very lonely person. Decedent's old friend, Mrs. Lupear, also testified that decedent was not a strong minded person where men were concerned. She testified that she and decedent had discussed this fact on several occasions. Mrs. Lupear testified that during one of these discussions after decedent had been separated from Vernon Denson, decedent said to her:
"`I'm tired of putting my ex-husbands up in business. It's going to make them wealthy men, just for being married to me for a few years. * * * I want to do something that will see that no more husbands get any of my money. * * * I don't plan on getting married again, but I  if I should where men are concerned, I have no control when they ask for *17 something; I give it to them, and I want something set up so that I can't change my mind.'"
Anton Choban testified that during 1957 while decedent and proponent were staying at his home prior to their marriage "Mrs. Denson was completely in Mr. McCauley's hands."
Other evidence tending to show decedent's susceptibility to undue influence concerns her chronic illnesses and physical condition. Mr. Simmer testified that during the period when he had frequent contacts with the decedent as his client in reference to her divorce from Denson that he noticed that decedent appeared to be chronically ill, often losing her equilibrium. Moreover, decedent's servant, Willie D. Fulleylove, testified that one of the reasons he didn't want to leave decedent in August, 1957, was that "She was a very sick girl." He testified that decedent had been chronically ill over the years he had known her and that "She wasn't a real well person."
As we noted above, at the time of the execution of the will in question decedent was hospitalized as the result of an automobile accident and a flare-up of her kidney disease. Mrs. Eulalie Hermann, one of the witnesses to the will and an employee of the hospital, testified that she had ascertained from hospital records that decedent's kidney disease was "something prolonged that she had had for years." Contrary to the testimony of Mrs. Marjorie Fuller who testified that decedent was out of bed and walking around the room at the time of executing the will, Mrs. Sara Goodman Coel and Mrs. Eulalie M. Hermann testified that decedent was propped up in her hospital bed and signed the will on a table that could be rolled up over the bed.
In addition to the testimony of the witnesses to the will we have the testimony of Atkinson and proponent referred to earlier to the effect that they had learned prior to the execution of the will in question that decedent was suffering from a serious kidney disease, so serious that proponent testified that decedent's doctor told him, "Actually I don't know what, she may live six months, she may live five years, she may outlive all of us."
Based on these facts showing decedent's weakened physical condition and her weakened resistance to the influence of men, the finder of the facts could properly conclude that decedent at the time of the execution of the will was a person particularly susceptible to undue influence.
In view of all the foregoing evidence and the principles referred to above, there was sufficient evidence at least to raise a question of fact as to whether proponent procured the execution of the will by decedent through undue influence. Faced with the task of finding the facts, the trial court found that the will in question had been procured by the undue influence of proponent. Since his finding in this regard is not "clearly erroneous", it cannot be set aside by us on appeal. Rule 52(a), Rules of Civil Procedure.
In his first and second assignments of error proponent claims (1) that the trial court found that the will was invalid on the ground that it had been procured by the fraudulent misrepresentations of the proponent, which was a theory not pleaded or relied upon by the contestants, and (2) that the trial court erred in granting contestants' motion to amend their complaint to conform to the proof to allege a theory not in issue at the trial, namely, that proponent made fraudulent representations to decedent. Since these contentions are two sides of the same coin, we shall treat them together as proponent did on oral argument and as contestants have in their brief.
Rule 15(b), Rules of Civil Procedure provides for an automatic amendment of pleadings to conform to proof as to issues tried by express or implied consent and also permits the granting of a motion to amend a pleading to conform to proof unless the objecting party can show actual, as distinguished from legal surprise. 2 Moore, Federal Practice ¶ 8.05, pp. 1626-1627 (2d ed. 1964).
*18 After judgment the court granted contestants' motion to amend their complaint to conform to proof by adding allegations of false representations as the means by which proponent exerted his undue influence over decedent.
Proponent urges that the trial court's order granting this motion to amend was erroneous. For several reasons we disagree. First, the alleged lack of timeliness of contestants' motion is not a proper ground for denying it inasmuch as Rule 15 (b) expressly provides that such motion may be made by any party at any time "even after judgment." Second, although fraud and undue influence are separate and distinct theories for invalidating a will, as we noted above, fraudulent representations made to a testatrix by a will's beneficiary are properly considered as relevant facts to show that a will was procured by the undue influence of that beneficiary exercised by him in part by means of such fraudulent representations. In re Garibaldi's Estate, 57 Cal.2d 108, 17 Cal. Rptr. 623, 367 P.2d 39 (1961). Third, it would be error for the trial court to refuse to allow an amendment of a pleading to conform to proof on the ground, which proponent suggests, that the amendment would be a change in theory. Robbins v. Jordan, 86 U.S.App.D.C. 304, 181 F.2d 793 (1950). Fourth, at trial proponent did not object to the introduction of evidence showing proponent's fraudulent representations on the ground that such evidence was not within the issues framed by the pleadings. His only objection was a continuing one on the grounds of lack of materiality and relevancy. In light of our previous discussion on the materiality and relevancy of fraudulent representations to show undue influence, this objection was not valid. Failure to object to the introduction of evidence on the ground that it is not within the issues is sufficient to imply consent to try such issues. O'Malley v. United Producers & Consumers Corp., 95 Ariz. 134, 387 P.2d 1016 (1963); 3 Moore, Federal Practice ¶ 15.13 [2] (2d ed. 1964).
Finally, proponent has failed to show how the amendment to conform to proof would prejudice, i.e., surprise, him in maintaining his defense on the merits as Rule 15(b) required him to do. Since the bulk of the testimony showing proponent's fraudulent representations to decedent was contained in depositions, including some which proponent himself set and noticed, it is difficult to see how he did not have notice that this proof would be introduced at trial and that he would be required to meet it. Rule 15(b) itself provides protection for a litigant who is surprised by proof offered at trial. He can object to the introduction of such evidence on the ground that it is not within the issues and if he satisfies the court that he would be prejudiced in presenting his case on the merits by the admission of such evidence, he may ask the court to grant a continuance to enable him to meet such evidence.[12] The cases cited by proponent are readily distinguishable from the case at bar. Mullen v. Gross, 84 Ariz. 207, 326 P.2d 33 (1958) holds simply that when a complaint alleges a fact and the answer admits the existence of that fact, there is no issue of fact between the parties as to that matter and the court cannot raise an issue of fact where there is none. Drumm v. Simer, 68 Ariz. 319, 205 P.2d 592 (1949) did not involve a granting by the court of a motion to amend to conform to proof.
Proponent's fifth and final assignment of error is an amalgam of different allegations which when analyzed, can be reduced to two essential contentions, viz., that the evidence was insufficient to sustain the trial court's findings and that the evidence relating to fraudulent representations was not properly before the court. We have previously discussed these contentions and find them to be without merit.
Affirmed.
*19 UDALL and McFARLAND, JJ., concur. STRUCKMEYER, Chief Justice (concurring).
The trial judge could have found from a consideration of all the evidence and the reasonable inference to be drawn therefrom that this was not the normal case of devotion and affection which one spouse usually holds for the other. Almost from the time McCauley first met decedent he sought to obtain money from her. Long before they were married decedent supplied McCauley with funds with which to take her out. At one time she loaned him $750. At another time she co-signed a $1,000 note with him for his benefit. He tried to acquire her automobile worth $2,000 for $100 and endeavored to sell to the trustees of her trust a $7,100 note for $7,000 when in fact the note had been discounted by $2,500.
It is possible to conclude that McCauley's relationship with decedent was one of almost continuous misrepresentations. In addition to the outright fraud involved in the instance of the foregoing note, McCauley represented to decedent that her stepfather and the trustees of the trust were cheating her, facts which were wholly untrue. Because of these misrepresentations, many of decedent's closest friends and advisors were alienated from her.
At the time when decedent first met McCauley, she lived with her mother. Some five or six months later she moved out of her mother's residence. McCauley misrepresented to decedent that her mother had bribed the jurors in the habeas corpus case by paying them each $1,000. Their relationship became so estranged that decedent's mother sided with decedent's former husband when he sought, successfully, to obtain the custody of decedent's minor daughter by reason of the misconduct of McCauley with decedent. McCauley even prevailed upon decedent to discharge her household servants of many years employment. Finally, he moved with her to Phoenix where she died.
McCauley arranged with decedent to engage an attorney who had known McCauley and his father and brother but had never met decedent. This attorney was employed to break the trust which decedent had set up for the benefit of her two children. He also drew the will here questioned in this litigation. This will was signed one year after McCauley's marriage to decedent. It left fifty per cent of her estate to him. The reason it did not leave the entire estate to him was because one of the attorneys advised that there would be a better chance of resisting a will contest if McCauley were given less than the whole.
This is a case which establishes that from the beginning McCauley dominated this woman, who admittedly had a weakness for men, to his own financial benefit. It taxes my credulity far beyond the breaking point to believe that this domination did not amount to undue influence.
BERNSTEIN, Vice Chief Justice (dissenting).
I must dissent. I think the majority has seriously erred in its statement of the applicable law as well as its analysis of the facts. The proposed definition of undue influence is correct, i.e., "a person unduly influences a testator or testatrix in executing a will when that person through his power over the mind of the testator or testatrix makes the latter's desires conform to his own, thereby overmastering the volition of testator or testatrix." We have defined undue influence as a showing that the instrument is not the testator's free act and results from the will of another substituted for the testator's. In re Regaldo's Estate, 77 Ariz. 180, 268 P.2d 973.
The opinion of the majority is that "certain factors have been treated as significant indicia of the presence or absence of such [undue] influence". I will refer to them as factors. Their definitions by the majority are generally correct, but particular factors are stated too broadly and require clarification.
*20 The first factor which is "[w]hether the alleged influencer has made fraudulent representations to the testatrix" must obviously be limited. Only misrepresentation relevant to the ultimate issue of undue influence may properly be considered. Such misrepresentations are only relevant if they tend to show that the mind of the testatrix was dominated thereby. In re Newhall's Estate, 190 Cal. 709, 214 P. 231, 28 A.L.R. 778. In other words, she must have relied upon and acted because of the false statements rather than other motives and inducements. In re Sprenger's Estate, 337 Mich. 514, 60 N.W.2d 436.
The next factor stated too broadly is "whether the will as drawn was consistent or inconsistent with prior declarations and plannings of the testatrix". Certainly the factor must be limited by a finding that the circumstances of the testatrix have not changed. For example, in this case testatrix executed a new will after the birth of her second child which was different from her prior will. The wills are "inconsistent" but there was a legitimate, logical reason for the difference.
The next factor could be construed to incorporate the point I have just made. It is "whether the will was reasonable rather than unnatural in view of the testatrix' circumstances, attitudes, and family". Unfortunately, as applied by the majority opinion the rule is indistinguishable from the preceding one dealing with the consistency between the will in question and prior declarations.
The next factor which requires clarification is "whether the testatrix was a person susceptible to undue influence". We are all susceptible to undue influence. I assume the majority means that we must balance the amount of undue influence exerted against the degree of susceptibility. In other words, we are concerned, quite properly, with the testatrix' ability to resist undue influence. One person will be influenced by things which will have no effect upon a person of stronger will.
The majority opinion is somewhat confusing. It appears to require evidence of all eight factors to raise the fact question of undue influence. They cannot mean that because one factor is the existence of a confidential relationship which, concededly, is not present in this case. I also note that we have recognized another factor relevant to the issue of undue influence, namely, whether the testatrix had ample opportunity after executing the allegedly improper will to have repudiated it. In re Regaldo's Estate, supra.
My strongest objection to the majority opinion is that it fails to account for or acknowledge the relevancy of the marital relationship. It has been said that:
"One of the influences exerted on testamentary disposition, not considered unusual or illegal, and to the contrary to be expected normally, arises in the relationship of husband and wife and their conduct one to the other." Hutton, Undue Influence and Fraud in Pennsylvania Wills, 52 Dickinson L.R. 225, 226. (Emphasis supplied)
And it has been further stated that:
"In determining whether there has been undue influence which will vitiate a will greater latitude is allowed between husband and wife with respect to persuasion or suggestion, because of the marital relation."
* * * * * *
"The relationship of spouse or fiancee does not constitute undue influence but rather the reverse". Thompson on Wills (3rd edition) § 144, p. 228 and pocket part § 144, p. 62; In re Rasnick, 77 N.J. Super. 380, 186 A.2d 527."
A woman, in response to her husband's solicitations, may change her mind and make a will which is valid although she would not have made it but for his influence. Henderson v. Jackson, 138 Iowa 326, 111 N.W. 821, 26 L.R.A.,N.S., 479; Cooper v. Cooper, 114 Ind. App. 261, 51 N.E.2d 100; Perkins v. Perkins, 116 Iowa 253, 90 N.W. 55; In re Detsch's Estate, 191 *21 Or. 161, 229 P.2d 264; In re Hettermann's Estate, 48 Cal. App.2d 263, 119 P.2d 788. The mere fact that one spouse dominates the other does not invalidate the latter's will made in favor of the former. In re Ritter's Estate, 181 Okl. 309, 73 P.2d 161; Canfield v. Canfield, 167 Okl. 590, 31 P.2d 152; In re Detsch's Estate, supra. Indeed, it has been held to be natural and proper that a husband or wife should exercise some influence over each other and should remember each other in their wills. Puryear v. Puryear, 192 Ark. 692, 94 S.W.2d 695; Lavenue v. Lewis, 185 Ark. 159, 46 S.W.2d 649; Cooper v. Cooper, supra; In re Kelly's Estate, 150 Or. 598, 46 P.2d 84. There is a presumption that a will made before marriage is revoked if no provision is made for the surviving spouse. A.R.S. § 14-134; In re Stark's Estate, 52 Ariz. 416, 82 P.2d 894. Such influence is legitimate and should be encouraged. Cooper v. Cooper, supra. It has been held that in the absence of a showing of fraud or duress, a wife's will is still her will and not the result of undue influence notwithstanding the fact that she comes to the state of mind where she decides to let her husband dictate its terms, provided she executes it as her will. Boland v. Aycock, 191 Ga. 327, 12 S.E.2d 319.
I think the majority opinion imposes the moral judgment of its members upon proponent and in so doing infringes upon the constitutionally protected privacy surrounding the marriage relationship. Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. The analogy to the Griswold decision is valid insofar as this court, as an arm of the state, may be imposing its moral judgment upon the constitutionally protected relationship. Cf. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Anno.: 3 A.L.R.2d 466, 479. Perhaps proponent and decedent had an affair prior to their marriage and perhaps he married her for her money. However, premarital affairs have absolutely no bearing upon the issue of undue influence and the fact that a man marries a woman for her money does not constitute fraud. Woronzoff-Daschkoff v. Woronzoff-Daschkoff, 303 N.Y. 506, 104 N.E.2d 877.
The evidence set forth in the categories referred to as factors by the majority must be viewed in the light of certain legal principles which they have ignored. The contestants alleged undue influence and had to prove their case by clear and convincing evidence. In re Pitt's Estate, 88 Ariz. 312, 356 P.2d 408. This court must determine whether there is substantial evidence in the record from which the fact-finder could reasonably find clear and convincing evidence of undue influence. In re Lamfrom's Estate, 90 Ariz. 363, 368 P.2d 318.
In the case before us, the trial court reached its decision upon a consideration of depositions and transcribed testimony of prior proceedings. Only a few witnesses actually testified before the trial court and they testified to matters not material to what we are discussing here. In such circumstances, there is no presumption favoring the findings and determination of the trial court. The Supreme Court of South Dakota stated the rule most succinctly:
"However, when the testimony on which the trial court makes a finding of fact or determines that a certain issue is established by clear and convincing evidence is presented to the court without the appearance before it of the witnesses who gave such testimony, then it is for us to determine whether a finding is established or the proof thereof is clear and convincing. (citation omitted) In such circumstances we review the evidence unhampered by the rule that a trial judge who has observed the demeanor of the witnesses, is in a better position to intelligently weigh the evidence than the appellate court. (citation omitted) That is the situation in this case.
"All of the testimony supporting the court's finding was taken by deposition. (except one witness) * * *

*22 "With the testimony presented to the trial court in this manner there is no presumption in favor of the trial court's determinations. Accordingly, it is our duty to review the evidence and determine the issues involved as though presented here in the first instance." State Automobile Casualty Underwriters v. Ruotsalainen, S.D., 136 N.W.2d 884, 888. Accord: Cochran v. Cochran, 247 Ala. 588, 25 So.2d 693. Contra: Griffith Company v. San Diego College for Women, 45 Cal.2d 501, 289 P.2d 476, 47 A.L.R.2d 1349; Martin v. Williams, 141 W. Va. 595, 93 S.E.2d 835, 56 A.L.R.2d 756.
With these principles firmly in mind, let us examine the evidence set forth in the factors upon which the majority rely.
The first category is entitled "fraudulent representations". The majority states that proponent's advertising business failed which made him "panicky" and prompted him to move to Houston. But the majority fail to note that by "panicky" he simply meant he wanted to "get to doing something else." Moreover, his advertising business was successful but the parent corporation failed. At that time he and his former wife discussed the matter and mutually agreed that he should try to get started in Houston near his family. The majority states proponent falsely represented to decedent that he had been separated from his then wife for some time before he went to Houston. In the trust litigation during February, 1958 decedent said in a deposition that proponent had been separated from his wife for some time when he came to Houston. But in the June, 1958 custody litigation as a result of which decedent's second husband, Vernon Denson, obtained custody of their daughter, decedent testified as follows:
"A He told me he was separated from her since July 19  well, he told me he had been separated from her for a long time, but he definitely broke off when he came down to Houston in July 1957  no, 1956.
"Q 1956.
"A That was the summer or winter of November I met him, whatever year that was.
"Q In July '56 
"A That is right.
"Q  is when he came down to Houston, is that when he broke off with her?
"A He had broken off with her before and tried to before.

"Q That is what he has been telling you, isn't that correct?
"A He told me he had been broken up with his wife for a number of years. (Emphasis mine unless otherwise noted)
This language suggests that proponent told decedent he had been having trouble with his wife for a long time. Decedent's use of the word "separated" is equivocal. In any event, decedent knew from the beginning of their relationship that proponent was a married man.
The majority creates an erroneous impression by stating only that proponent's marital relationship with his wife was normal through March, 1957 although he told decedent he had been separated for some time. In fact, he had not seen decedent from November 1956 until March 1957 and during that particular period his marital relationship was normal according to his wife. She said their marriage was seriously disturbed from April, 1957 when he returned home at which time he discussed a divorce. In other words, as soon as he became involved with decedent he discussed a divorce with his wife. Certainly he acted with greater frankness than if he had continued to conceal his relationship with decedent.
The majority states that shortly after September, 1957 "proponent convinced decedent that the trust res would be dissipated by the trustees and her ex-husbands, thus persuading decedent to consult an attorney to attempt to revoke the trust." Suit was in fact instituted September 1957 one month before decedent and proponent were married. Judgment upholding the trust was *23 entered after decedent passed away. McCauley v. Simmer, 336 S.W.2d 872 (Tex. Civ.App.). To support the conclusion of undue influence, the majority opinion relies primarily upon the facts that the suit to break the trust was filed after decedent met proponent and that the will in question authorizes him to continue litigation to have the trust revoked. This is supposed to be against decedent's long established wishes and contrary to her clearly expressed reason for creating the trust. I will subsequently quote the record to prove that decedent was dissatisfied with the trust from its inception and probably would have attempted to set it aside regardless of proponent's purported encouragement. In any event, to return to the issue of "fraudulent representations" I contend that the inference of an evil scheme by proponent to persuade his wife to break the trust is wholly unsupported by the record. In the custody litigation, decedent testified:
"Q At his (proponent's) suggestion and advice and counsel, you filed a suit against the trust to set it aside, isn't that correct?
"A I filed a suit against the trust, but not on the advice of Mr. McCauley.
"Q Didn't he advise with you about that?
"A No.
"Q I beg your pardon?
"A He sat down and explained to me what the trust is about. If that is advice, yes, he did that.
"Q What did he tell you the trust was about?
"A He told me that the trust could steal me blind if I didn't do something about it."
* * * * * *
"Q Now you are trying to set it aside because C.F. McCauley said you ought to try to break it, isn't that right?
"A No.
"Q You didn't say C.F. McCauley said you ought to break the trust? I thought you said while ago he told you you ought to break it.
"A I am not trying it on  he told me I should break it, but that wasn't why I was doing it.
"Q I see. You are doing it on your own action 
"A That is right.
"Q  but he told you to do it, isn't that correct?
"A He suggested that I do it. He suggested I see a lawyer, which I did 
"Q All right.
"A  and the lawyer suggested I break it."
This is the only testimony in the record to support the majority's statement that proponent convinced decedent the trust was being dissipated and persuaded her to see about revoking it. What could be more natural than husband and wife discussing personal economic matters? Indeed, what is wrong with a wife seeking and following the advice of her husband? See the cases above supporting this analysis.
In addition to the erroneous inference drawn by the majority from the above quoted testimony, there is separate, additional testimony which the majority has failed to consider. During February, 1958, five months prior to the custody litigation, decedent's deposition was taken in connection with the trust suit. She testified:
"Q Now, I want to ask you, Mrs. McCauley, what discussions did you have with Mr. McCauley about this trust instrument before you were married?
"A Oh, I don't know. We had quite a few.
"Q. Well, in substance, what were they?
"A Well, when, I couldn't  I think probably the main ones took place after I found out I couldn't get my car and I was unhappy about that, and I asked him if he could help me, explain, that I still wasn't real sure about all the legality and exactly *24 what all that trust meant and maybe he could help me, and he did sit down with me one day and he did help me to go over it and lay it out in layman's language."
Discussions of this nature between people about to be married or spouses are to be encouraged rather than condemned as suggesting any evil, improper or fraudulent scheme.
The majority states proponent experienced an apparent seizure during which he represented to decedent that he was a messenger to her from someone in Heaven. We are then told decedent confided in an old friend that she believed in communications from spirits. It is interesting to note that the entire episode was testified to by decedent's 10-year-old daughter who was only seven when the event allegedly occurred. She said she saw proponent lying on the bed and her mother sitting on the bed, both fully clothed. The questioning proceeded as follows:
"Q Now, did you see anything that was unusual when you looked in there?
"A Yes, sir.
"Q What did you see?
"A Well, he was acting like a 2-year old waving his hands and kicking his feet."
* * * * * *
"Q All right. Now did your mother then afterwards tell you what Mr. McCauley was doing or what he had done?
* * * * * *
"A She said he was some messenger from somebody up in Heaven to her.
"Q He was a messenger from somebody up in Heaven to her?
"A Yes, sir.
"Q Do you remember who it was that he was a messenger from, who he was from?
"A No, sir.
"Q Did she tell you the name at the time?
"A I think she did, but I don't remember.
"Q You don't recall it?
"A No, sir."
She then said it was the only such occurrence she saw. It appears to me that the majority is scraping the bottom of the barrel when it relies upon this sort of hearsay testimony to support a finding of fraudulent representation. In re Pitt's Estate, supra. The record does not show that proponent "represented to decedent" that he was a messenger to her from somebody in Heaven. It does not show that he made any representations to her. I think the omission further deprives the daughter's testimony of any value it might otherwise have had. Furthermore, if the child had testified that proponent told decedent he was a messenger from Heaven, I still refuse to give it any weight. She was a ten-year-old testifying to an event which occurred three years earlier. Her infancy may properly be considered as affecting the weight of her testimony. 58 Am.Jur., Witnesses, § 869, p. 498; 98 C.J.S. Witnesses § 461, p. 324.
The majority states that proponent promised the witness Choban, a realtor, a life-time income once decedent regained control of her wealth. Actually, Choban testified as follows at a deposition in connection with the trust litigation:
"A Well, in return for that, (refuge in his home) should the day come about when Bond Sneed Denson once again came into the control of her own wealth, then under Mr. McCauley and Bond Sneed Denson  because again as I best recall in later conversations, Bond Sneed Denson was aware of all this  I was to serve in the capacity of overseer for the various properties belonging to Bond Sneed Denson * * *."
In the 1958 custody suit he was asked:
"Q When he (proponent) told you you would have a job, he didn't tell you you wouldn't have to work, did he?

*25 "A Oh, no. I don't want a job for life without working. I have worked all my life.
"Q If you were going to manage this property that was going to be a job and you were going to be paid for it.
"A Absolutely.
"Q Did he tell you you were going to sit in an easy chair and he would dole out the money to you?
"A He never did. * * *"
Choban was not to receive a "lifetime income", he was to have a job to earn his salary. He was asked whether his conversations with proponent concerning future employment were out of decedent's presence. He replied:
"A A good percentage were. Yet, on the other hand, Bonnie was present at some of the conversations and I feel sure I am speaking truthfully of instances she concurred, at least to a point, you know, I would fit in the capacity such as mentioned."
Decedent apparently approved of employment for Choban. But my basic contention is that her knowledge of this matter is wholly irrelevant to the issue of undue influence.
The majority next tells us that proponent falsely represented to decedent that her mother bribed the judge and jury to decide the custody case adversely to her and that her stepfather stole her inheritance.[1] This information was elicited from a Mrs. Lupear who claimed to be decedent's lifelong friend. She testified to the above hearsay at a deposition held April 11, 1960 at which the only attorneys present were Mister Simmer representing the contestants and Miss Gann representing Mrs. Lupear. No one represented proponent. There was no cross examination. For these reasons and others which I will subsequently discuss, very little weight can be given to Mrs. Lupear's testimony.
All of the above excerpts from the record illustrate what I respectfully submit are factual misconceptions in the majority opinion under the heading "fraudulent representations". But there is another fallacy contained in the majority's analysis of the facts. As I pointed out above, not all fraudulent representations may be considered as bearing upon the ultimate fact in issue, namely, the existence of undue influence. We can only consider those false statements by proponent which logically suggest an attempt to induce decedent to bestow her testamentary favor upon the object of proponent's wishes, in this case, himself. With this principle in mind, I question the relevancy of the following facts: proponent's business in Oklahoma and his relationship with his wife Leona; decedent's $750 loan to proponent soon after they met; his statement to decedent that he was separated from his wife since decedent knew he was married; the fact that they saw each other frequently after decedent obtained her divorce; that she cosigned a $1,000 note for proponent's benefit; that he attempted to sell a real estate note to the trust or that he was to receive a $1,000 commission from the owner for selling it; that decedent wrote attorney Simmer asking him not to mention the matter and upset her family since she did not get involved and had no strong feeling for proponent at that time; that proponent visited decedent at her apartment "spending most of the day and evening there"; that proponent told her she could only get $100 trade-in on her automobile; that she discharged her servants upon proponent's suggestion that they cost too much; that Choban was to obtain employment if decedent regained her wealth; that they were married the same day proponent obtained his divorce from Leona; *26 that he told decedent her mother had bribed the judge and jury in the custody case and that her stepfather had stolen her inheritance. Some of the above facts were not demonstrated to be false. Some do not demonstrate an attempt to alienate decedent from those she had theretofore acknowledged as the natural bounty of her affection  her children. None of the above facts separately nor all together constitute fraud which requires the concurrence of nine separate elements, United Benefit Fire Ins. Co. v. First Nat. Bank of Ariz., 1 Ariz. App. 550, 405 P.2d 488, namely, (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, (9) his consequent and proximate injury. Higgins v. Kittleson, 1 Ariz. App. 244, 401 P.2d 412. In this connection, I note that In re Garibaldi's Estate, supra, relied upon by the majority to support the principle that "fraudulent representations" is a factor evidencing undue influence, speaks of "fraud", not "fraudulent representations". The California court did not decide whether false representations are evidence of undue influence.
The next factor in the majority opinion is "Will Product of Hasty Action". Unless this court is prepared to accuse attorneys Atkinson and Kirchheimer of conspiring with proponent to commit a fraud and unduly influence decedent in the disposition of her estate by hastily preparing the will, there is nothing arguably supporting an inference of undue influence. The majority does not accuse the attorneys of improper conduct. But if they did, I am of the opinion that the will was not so hastily drawn as to suggest an effort to "put something over" on decedent. It is common knowledge that attorneys often use the telephone to transact business. Cf. Schering Corporation v. Cotlow, 94 Ariz. 365, 385 P.2d 234. Nor is ten minutes to sign and execute a simple will unusually brief. The fact that Atkinson did not discuss with decedent the extent of her property may be attributed to the desires of decedent or the fact that Atkinson and Kirchheimer represented her in the trust suit and had detailed knowledge of the extent of her estate. Another reason is that giving one-half to the children and one-half to the surviving spouse does away with the necessity of discussing the nature and extent of the estate. There was no need to discuss the guardianship of the children because the son had gone to live with his father and the daughter's custody was obtained by her father in the 1958 custody proceeding.
Finally, the majority says it is significant that Atkinson and proponent learned that decedent suffered from a serious kidney disease and I assume by this they conclude that proponent rushed decedent into signing a will because she was about to die. This conclusion is not supported by the record. Decedent was admitted to the hospital as a result of sustaining a whiplash injury in an automobile accident a few days before. While there, tests revealed a kidney disease which decedent may have had and been unaware of for some time. The doctor told proponent decedent could live six months, five years, or outlive all of them. Decedent lived almost a year after executing the will.
The next factor of the majority is entitled "execution of Will Concealed" wherein it is stated that the will was given to proponent on one of his trips to Houston after he and decedent had moved to Phoenix. That fact is utterly without significance. It is said that execution of the will was concealed because decedent's two children and her mother had not been informed. The children, ages eight and thirteen, did not live with decedent. The relationship between decedent and her mother was not friendly. Most importantly, there is no evidence that proponent or anyone else *27 deliberately prevented decedent from discussing her will with others. Moreover, it was within the province of decedent to keep her will confidential. Avoiding publicity of such matters is perfectly normal. Certainly the majority does not contend that proponent had a positive duty to inform all possibly interested persons that decedent had executed a new will.
The next factor is labelled by the majority "Activity in Procuring Drafting and Execution of Will" where it is stated that proponent obtained a holographic will from decedent which his lawyers advised him was worthless. He then discussed with decedent the terms of the will in question. The majority opinion obviously concludes, without so stating, that these facts prove proponent only wanted decedent's money. The facts equally support an inference that decedent had a strong determination to create a legal will leaving proponent one-half her estate. But I do not think it necessary to choose between the inferences because the underlying facts were not proven by the record. Choban testified that proponent told him about the holographic will. Choban said proponent told him his attorneys said the will was no good. And Choban understood that proponent meant Atkinson and Kirchheimer. But in their respective depositions, proponent, Atkinson and Kirchheimer denied any knowledge of such a will. Moreover, the attorneys denied discussing a holographic will with proponent at any time. They also recognized the validity of such wills in Texas, contrary to what Choban said the attorneys told proponent.
The majority tells us "[p]roponent was told to absent himself from the hospital at the time of execution. Proponent inquired about a will to leave him all of decedent's property, although he was informed by Atkinson that such a will probably would not withstand contest. Atkinson and proponent discussed the probable validity of the will in question as against contest and concluded that such a will had a better chance of success than a will leaving all of decedent's property to proponent." Let us review what Atkinson said:
"Q I will ask you whether or not Mr. McCauley told you what to put in this will?
"A No, sir, he did not. They may have discussed it between each other, because I do recall that Mr. McCauley made mention of the fact that he knew his wife wanted a will and was going to have one made."
* * * * * *
"A I must make the assumption that they probably discussed it between each other, but I don't know that they did."
* * * * * *
"A I said, `Bonnie, I believe it would be best if Mr. McCauley is not present when you sign that will. These Trustees have contested everything else you have done. Should it ever be necessary to probate this will, they will probably file a contest of the will if you leave anything in the will to him, and it would be best if he not be present because they will try to use that to say that he told you what to do.'"
* * * * * *
"Q But after the will was signed, he talked to you at one time or another 
"A No.
"Q  and told you he wanted a will leaving everything to him?
"A We didn't go into it specifically. He talked around a little bit but nothing was done  just talk, nothing done.
"Q You refused 
"A No.
"Q  to draw it that way?
"A That kind of will, no, I didn't refuse to draw it. I probably would have drawn it if he had asked me, but he didn't ask me to do it."
*28 The record is devoid of evidence to support a finding that proponent tried to get Atkinson to draw a will leaving the entire estate to proponent. Since Atkinson, with Kirchheimer, represented decedent in the suit to break the trust and knew of the animosity between the trustees and decedent, it was perfectly normal for him to discuss the validity of the will since he knew the trustees would contest any sort of disposition to proponent.
The next factor discussed by the majority is called "Inconsistency of Will with Other Plannings and Declarations". The first inconsistency mentioned is the fact that the will in question does not contain trust provisions for decedent's minor children whereas three previous wills did so provide. There is a completely satisfactory explanation. Decedent was trying to break the existing trust which action was still pending at her death. She had every intention of creating a new trust for her children if successful in that litigation. The majority opinion acknowledges this fact.
The majority also thinks it significant that decedent left no property to either of her former husbands. She married her first husband in 1940. One year later he entered the military service and did not return until 1945 after which they did not cohabit. They were divorced December 1946. The first will was executed in November 1944 shortly before her husband returned. It is reasonable to assume decedent knew at the time she made her will that a divorce was likely thus making no provision for him. Decedent met her second husband the first part of 1947 and they were married in December of that year. Her second will was executed February 1947 about the time she met her second husband. Obviously she would make no provision for him. The third will was executed May 1955. Decedent and her second husband separated in 1955 although they were not divorced until 1957. Again, it is perfectly natural that she made no provision in her will for him since they had separated or were about to do so. Nor is it unusual that decedent provided for proponent in her last will. The record is devoid of the slightest evidence suggesting any friction between them. In fact, they began adoption proceedings in Arizona to begin their own family and gave every appearance of being happily married. Therefore, it would not be unexpected for her to leave him one-half of her estate, particularly in view of inheritance tax advantages to husbands and wives.
The majority tells us that decedent's avowed purpose in establishing the irrevocable spendthrift trust was to avoid any repetition of the marital difficulties and property settlements she had experienced in the past. Let us review what decedent actually said. In the trust litigation she testified:
"Q Well, what did you think it meant? (the trust agreement)
"A I thought that it was to keep any future husbands from getting a-hold of any community property settlements. That was what Mr. Monroe and Mr. Simmer had told me was the purpose of the trust."
* * * * * *
"A I don't remember reviewing the entire trust agreement. (with Hill) I don't think I even knew what it was about. I was informed it was just a lot of legal language and not to pay any attention to it. * * *
"Q All right. What did you tell Mr. Hill was to be the nature of the trust?
"A That it was to keep any future husbands from getting my property and to keep any past ones from getting a-hold of it.
"Q And just how was that to be accomplished by this trust?
"A Well, it was supposed to be in trust for my children, and I was to be the head. They would manage and advise me.
"Q And under whose control was it to be?

*29 "A Mine."
* * * * * *
"A Well, they (the trustees) told me that I could have a voice in the managing of my property, that I could say how it was to be run and that they were to advise and help me, but nobody has paid any attention to anything that I have wanted done. In fact, they have gone completely opposite to my directions."
* * * * * *
"A Well, I was informed  I was told, rather, that any time that I needed extra money that I could have it. I was not given that extra money when I wanted it."
It is clear that decedent thought the trust fund would prevent past or future husbands from obtaining her property but would not deprive her of control of or at least relatively free use of her money. She said:
"A My reasons were that I wanted to have a trust fund to keep any future husbands from getting hold of my property. I didn't want to have it all tied up, but I certainly didn't want to go through any community property settlements again."
The majority opinion contends the will in question is inconsistent with the trust, decedent's reasons for establishing the same, and her prior wills. As I noted above, I think the record contains a reasonable explanation for the differences among the wills. The particular will before us is consistent with the trust agreement. In the will, decedent amply provided for her children. In the trust she did likewise. Her reason for creating the trust was to avoid property settlement agreements with future husbands. That contemplates marital difficulty. She was tired of "community property settlements". But it was entirely consistent for her to give part of her wealth to proponent because the record is uncontradicted that decedent was very much in love with proponent and their marriage was a happy one. Furthermore, the majority opinion recognizes that decedent intended to create another trust fund for her children if she succeeded in breaking the existing trust. Differences are not inconsistencies if additional reasons prompt a new course of action. And if those reasons are arguably proper, an inference of undue influence cannot be drawn.
The majority quotes from a letter written by decedent at the time the trust was created:
"I did it because I don't want to have to go through any more property settlements with any  if any  future husbands. I also do not want my children to be subjected to what I have experienced in the past."
The sentence immediately preceding the quoted language was:
"At the very strong insistence of Mr. West, I have put my money and property in a trust fund." (Emphasis in the original)
The seed of dissatisfaction existed when the trust was created and it led to decedent's effort to break the trust independent of any encouragement by proponent. This is again supported by her testimony in the trust litigation:
"Q Well, did Mr. West participate in the setting up of this trust?
"A He certainly did.
"Q In what way?
"A He told them how to set it up.
"Q Told who?
"A Mr. Simmer and Mr. Monroe. * * *
"Q And he wanted it set up for the same reasons that you wanted it set up?
"A That's what he told me, uh-huh."
* * * * * *
"Q All right. Now, what were his reasons?

*30 "A Well, on the surface, that was what he said he wanted, (her reasons) but that wasn't it.
"Q Well, what was it?
"A He wanted to get me to where I was completely dependent on the trustees, that I would have to ask them for everything I wanted, regardless of what it was. I have never had that happen to me before. I didn't want it to happen then, and I was told that it wouldn't be that way, but he told me that he would have that trust fund set up so I couldn't have any say so over that matter."
She subsequently repeated her reason for creating the trust.
"A It said the people would be protected and I would be protected against any future property settlements, but I certainly didn't take it to mean that I couldn't have any control or say so about it."
All of the above conclusively shows that decedent was dissatisfied with the trust from its inception. It is apparent that proponent had very little to do with her desire to set it aside.
Next, the majority again relies upon decedent's old friend Mrs. Lupear whose deposition was taken by Mister Simmer in the absence of representation for proponent and thus in the absence of cross examination. Mrs. Lupear said decedent visited her a month or two after the will was executed and told her she had mentioned Mrs. Lupear's daughter in her will. Then decedent allegedly turned to proponent and said "you know I can't leave you anything". The relevancy of these remarks, if made, bears exclusively upon the issue of mental competency, not undue influence. I will not belabor the obvious. But let me examine Mrs. Lupear's deposition more closely. Mrs. Lupear, the mother of three children, worked as a medical secretary when her deposition was taken in April 1960. She initially contacted Mr. Simmer, after decedent's death, asking about a will leaving her daughter some property. She told him she understood that she and her daughter were supposed to be in decedent's will because decedent was godmother to her youngest daughter. Mrs. Lupear's interest is quite apparent and her testimony should be weighed accordingly. Generally, the deposition consisted of leading questions. The testimony dealing with the will was as follows:
"Q Now, the date of this purported will, * * * is the 18th day of November, 1958, and it was drawn in Houston, Texas. Was your discussion with Mr. and Mrs. McCauley about a will after November 18, 1958?
"A It was after they moved to Phoenix.
"Q It was after Mr. and Mrs. McCauley moved to Phoenix?
"A It was after Mr. and Mrs. McCauley moved to Phoenix.
"Q And you recall that was around Christmas time of 1958, is that right?
"A Just prior to Christmas.
"Q So, it was sometime then, after this date of November 18, 1958, that you had a conversation with Mr. and Mrs. McCauley?
"A It was.
"Q What, if anything, did Mrs. McCauley tell you she had done with her property by will?
"A She told me that  the conversation started with her mentioning that she had mentioned Nancy Jean in her will. (Mrs. Lupear's daughter)
"Q All right.
"A I told her that I didn't feel that was at all necessary.
"Q Do you recall what she said about the amount, or anything that she left?
"A She said, `I would like to leave her about fifty thousand dollars, but I don't think that would be possible.'

*31 "Q All right.
"A She said, `I have mentioned her in my will,' 
"Q All right, did she tell you that she had left you anything in her will?
"A She told me that she left me no money or property other than a watch, for sentimental reasons.
"Q Do you know what watch?
"A Yes, sir, it was one I had admired on several occasions.
"Q What kind of watch?
"A A gold watch, with some gems that had a cover on it to make it look like a bracelet.
"Q And was that the watch she told you she had left you in her will?
"A Yes, sir.
"Q Was Mr. McCauley present at that conversation?
"A Yes, sir.
"Q Did she say anything to Mr. McCauley about a will at that time?
"A Yes, sir, we were discussing this, and she turned to Farris and said, `You know I can't leave you anything.'"
The 1955 will which, presumably, would be probated if the one before us is not, gives $1,000 to Mrs. Lupear and nothing to her daughter although it suggests the money be used for the daughter. No mention is made of a watch. If decedent, in fact, said what Mrs. Lupear claimed she did, she may have been incompetent at that particular time. Certainly a layman like proponent would have thought so. Under those circumstances, was it unreasonable for him to refrain from arguing with his wife over the disposition of her property? I think not.
The next factor in the majority opinion is entitled "Reasonableness" or "Unnaturalness" of Will which is tested by the question of whether the will is the type one would expect testatrix to execute, after we consider what is known about her. In my opinion, the bulk of the evidence considered under this factor cannot be distinguished from that considered in the preceding factor. In any event, it is perfectly natural for a wife to leave one-half of her estate to her children and one-half to her husband whom she obviously loved. The only new facts mentioned under this factor are that the will names proponent as sole executor whereas the prior wills provided for multiple executors and replacements; and that the will is one and one-half pages in length whereas the prior wills were eight, eleven and thirteen pages in length. The length of the will is related to the complexities of the provisions, not the size of the estate. And the absence of joint or replacement executors probably reflects the competency of the scrivener. It is a rather technical matter which lay persons do not ordinarily consider, but has nothing to do with the problems before us.
The final factor of the majority opinion asks "Was Decedent a Person Susceptible to Undue Influence". We are told that trustee Hill said decedent was imprudent with men. He testified as follows:
"A * * * She was imprudent with men, and I don't mean that in a derogatory manner. I mean that she had a weakness which was founded, I believe, in two things. She was, according to my recollection of her as a little girl, she was in a sense a very lonely person, and therefore the attention of men when offered to her was most gratefully received. And I mean in an entirely proper manner. She was raised in a family in which generosity was the greatest single attribute of the present generation. * * *"
* * * * * *
"Q * * * Now, do you feel that her weakness, as you have described it, with men, rather than with money, applied to her marriage to Mr. Talk? (first husband)
"A I think they applied to every relation of hers from the time she was a very small girl until the date of *32 her death. Men in general, including myself, I don't mean that she was ever attracted to me, I just mean that she appreciated the attentions that were showered upon her from time to time by men. She was unusually grateful upon each occasion that my wife and I would offer to give her a ride home from a party or something of that nature."
The "susceptibility" referred to in the decisions cited by the majority has nothing to do with a lifelong attribute of generosity. The cases cited by the majority concerned aged, feeble people suffering from hallucinations, eccentricities or phobias and usually seriously senile or physically ill. Mrs. Lupear is again relied upon to quote the exact words decedent had spoken three years earlier.
`"I'm tired of putting my ex-husbands up in business. It's going to make them wealthy men, just for being married to me for a few years. * * * I want to do something that will see that no more husbands get any of my money. * * * I don't plan on getting married again, but I  if I should where men are concerned, I have no control when they ask for something; I give it to them, and I want something set up so that I can't change my mind.'"
Assuming the conversation took place, decedent probably gave Mrs. Lupear the same reasons for creating the trust as she subsequently testified to in the trust litigation. Furthermore, the conversation took place before decedent's divorce from Denson. Wasn't she entitled to change her mind?
The majority suggests that decedent's chronic physical illness rendered her more susceptible to undue influence. No a shred of medical evidence is mentioned. Reference is made to Mr. Simmer's testimony that he noticed decedent often lost her equilibrium and appeared to be chronically ill about the time she received her divorce from Denson. The basis for his conclusion was the fact that she was fairly untidy, had protruding eyes and a puffiness around her eyes, had bad skin and looked older than her years. Mr. Fulleylove's (a servant) conclusions that decedent was a "very sick girl" and not a "real well person" are unsubstantiated conclusions. The majority concludes from this meager testimony that decedent was in a weakened physical condition when she executed the will. A witness who signed the will said "her condition was very good; she was in good spirits, a pleasant frame of mind" and "she seemed to have full control of her faculties. She seemed to be a very stable person to me. She appeared in good health, appeared to be recuperating from her trouble". There is no evidence to support the conclusion that decedent, at the time of executing the will, was a person susceptible to undue influence.
Some writers have argued that the standard definition of undue influence as "domination by the guilty party over the testator's mind to such an extent that free agency is destroyed" is misleading. They claim psychologists tell us that in one sense man has no free agency and every course of action is actually the reflection of various motivations or influences. Wills, Wills  Undue Influence, 50 Mich.L.R. 748, 749. It follows that a distinction must be made between due influences and undue ones. This would allow a court to judge the moral quality of the influence because that is what the word "due" means. One writer has gathered decisions where this has been done. Collins, Undue Influence in Wills, 7 Ark.L.R. 116, 123-125. I think the majority opinion follows this line of reasoning. Such a course of action destroys the right of testamentary disposition generally and in this particular case invades the right of marital privacy.
I am particularly grieved by the concurring opinion of our Chief Justice. Some of the facts upon which he relies are obviously irrelevant to the issue of undue influence. It is sufficient to point out that he merely repeats the facts set forth by the majority *33 apparently believing, like the Bellman, that what is said three times must be true:
"Just the place for a Snark!" the Bellman cried,
As he landed his crew with care;
Supporting each man on the top of the tide
By a finger entwined in his hair.
"Just the place for a Snark! I have said it twice:
That alone should encourage the crew.
"Just the place for a Snark! I have said it thrice:
What I tell you three times is true."
Lewis Carrol, The Hunting of the Snark, Fit the First.
I am in agreement with the majority opinion on the procedural aspects of this case. But I must dissent for the reasons set forth above. The judgment should be reversed.
NOTES
[1] In re Garibaldi's Estate, 57 Cal.2d 108, 17 Cal. Rptr. 623, 367 P.2d 39 (1961).
[2] In re Day's Estate, 198 Or. 518, 257 P.2d 609 (1953).
[3] In re Burton's Estate, 45 So.2d 873, 875 (Fla. 1950).
[4] In re Westfall's Estate, 74 Ariz. 181, 245 P.2d 951 (1952). California has recently held that without a showing that the proponent was active in procuring the execution of a will a finding of undue influence cannot be sustained. In re Fritschi's Estate, 60 Cal.2d 367, 33 Cal. Rptr. 264, 384 P.2d 656 (1963).
[5] In re O'Connor's Estate, 74 Ariz. 248, 246 P.2d 1063 (1952); In re Westfall's Estate, 74 Ariz. 181, 245 P.2d 951 (1952).
[6] Lancaster v. Bank of New York, 147 Conn. 566, 164 A.2d 392 (1960); In re Lavelle's Estate, 122 Utah 253, 248 P.2d 372 (1952).
[7] In re Leonard's Estate, 92 Cal. App.2d 420, 207 P.2d 66 (1949); In re Payne's Estate, 94 Cal. App.2d 504, 210 P.2d 916 (1949); Marcum v. Gallup, 237 S.W.2d 862 (Ky. 1951); In re Urich's Estate, 194 Or. 429, 242 P.2d 204 (1952); Taylor v. Taylor, 248 S.W.2d 820 (Tex.Ct.Civ. App., 1952); In re Feeley's Estate, 253 Wis. 204, 33 N.W.2d 139 (1948).
[8] See In re Pitt's Estate, 88 Ariz. 312, 356 P.2d 408 (1960); In re O'Connor's Estate, 74 Ariz. 248, 246 P.2d 1063 (1952).
[9] For extended discussions on the subject of this presumption, see In re Wood's Estate, 374 Mich. 278, 132 N.W.2d 35 (1965); In re Swan's Estate, 4 Utah 2d 277, 293 P.2d 682 (1956).
[10] See, e.g., In re Pitt's Estate, 88 Ariz. 312, 356 P.2d 408 (1960), confidential relationship, activity in the preparation of the will, plus proponent's status as principal beneficiary of the will held to be insufficient; In re Fritschi's Estate, 60 Cal.2d 367, 33 Cal. Rptr. 264, 384 P.2d 656 (1963), opportunity to exert undue influence plus motive to exert undue influence held to be insufficient in themselves to constitute undue influence; In re Johnson's Estate, 326 Mich. 310, 40 N.W.2d 163 (1949), opportunity to exert undue influence plus testator's inconsistent statements held to be insufficient to constitute undue influence.
[11] See the similar evidence cited in In re Arnold's Estate, 147 Cal. 583, 588-589, 82 P. 252, 253-254 (1905).
[12] See Hall v. Delvat, 95 Ariz. 286, 389 P.2d 692 (1964); Newmann v. Zinn, 164 F.2d 558, 559-560 (3rd Cir.1947).
[1] In the custody litigation, one of the attorneys representing Mr. Denson was the son of the judge who presided over the trial. See East Maine Twp. Community Ass'n v. Pioneer Trust & Sav. Bank, 15 Ill. App.2d 250, 145 N.E.2d 777.