NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In the Matter of the Estate of:

THOMAS K. KOMA, *Deceased.*

ALICE KOMA, *Petitioner/Appellant,*

*v.*

ARTHUR PETER WALTER, *Counter-Petitioner/Appellee.*

No. 1 CA-CV 14-0447
FILED 3-8-2016

Appeal from the Superior Court in Yavapai County
No.  P1300PB201100209
The Honorable Michael R. Bluff, Judge

**AFFIRMED**

COUNSEL

Prescott Law Group, PLC, Prescott
By J. Andrew Jolley, Taylor R. Nelson
*Counsel for Appellant*

J. Jeffrey Coughlin, PLLC, Prescott
By J. Jeffrey Coughlin
*Co-Counsel for Appellee*

Eric S. Chester, Prescott
*Co-Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Samuel A. Thumma delivered the decision of the Court, in which Presiding Judge Kent E. Cattani and Judge Randall M. Howe joined.

---

**T H U M M A**, Judge:

**¶1**         Alice Koma (Alice) appeals from a judgment, entered after a bench trial, rejecting her challenges to a will for Thomas K. Koma (Thomas) and to an amendment to Thomas' trust, both signed in 2011. Because Alice has shown no error, the judgment is affirmed.

### FACTS[1] AND PROCEDURAL HISTORY

**¶2**         In January 2000, Thomas created the Thomas K. Koma Trust, naming himself trustee. In February 2001, Thomas named Alice successor trustee. In April 2001, at a time when Alice was still married to another man, Alice and Thomas held a marriage ceremony and thereafter often lived together as a couple until Thomas died in September 2011.

**¶3**         After 2001, Thomas amended his trust several times using documents prepared by California attorneys. In September 2004, Thomas amended his trust (as amended, referred here as the 2004 Trust) to name Alice the primary trust beneficiary. At the same time, Thomas executed a will (the 2004 Will) naming Alice his personal representative and directing that all of his property be transferred to the 2004 Trust upon his death. Although each trust amendment after the 2001 marriage ceremony referred to Alice as Thomas' wife, Thomas did not tell Alice of the amendments

---

[1] This court reviews the evidence in a light most favorable to sustaining the judgment. *In re Estate of Newman*, 219 Ariz. 260, 263 ¶ 3 (App. 2008).

when he made them, nor did he consult Alice or keep her informed of his estate plans.

¶4         In 2006, Alice moved from the home she shared with Thomas in Lake Havasu to a home in Prescott; she lived there separately until Thomas joined her in December 2009. After Thomas began living with Alice again in late 2009, he spent "most of his time alone in his room," reading and watching television. After moving to Prescott, Thomas began attending Christian Fellowship Church, commonly known as Potter's House. Thomas attended Potter's House almost every Sunday from March 2010 until his health made attendance impossible in April 2011. In March 2010, Thomas met Arthur Peter Walter and Charles Foster at Potter's House, and became friends with both men. Walter had acted as a pastor for two different congregations between 1983 and 1995. He was not, however, an employee or in any position of authority at Potter's House during the time he knew Thomas.

¶5         Other than Alice and a few friends at Potter's House, Thomas generally kept to himself, rarely receiving visitors or visiting others. Thomas did, however, frequently speak with Foster. During those conversations, Thomas often mentioned his discontent with his marriage to Alice. Thomas also told Foster of his desire to leave a portion of his estate to Potter's House, which would decrease what he left to Alice, first mentioning this desire in the summer of 2010 and discussing it with Foster several times thereafter. Thomas also stated that he relied on Alice for transportation and feared that asking Alice to drive him to see an attorney would cause problems.

¶6         In April 2011, Thomas suffered serious injuries from a fall that resulted in his hospitalization and continuous care in medical facilities until his death on September 24, 2011. During that time, Alice visited Thomas twice each day. During an early visit, Thomas asked Alice to have Walter come to visit him. At Thomas' request, Walter thereafter acted as co-power of attorney with Alice for Thomas' medical decisions. Pastors from Potter's House and other church members also visited Thomas, including Foster, who visited a few times per week.

¶7         During his visits with Foster, Thomas again discussed his estate planning, telling Foster and Toni McMillan (another person he knew from Potter's House) that he wanted to disinherit Alice. Foster's response was that Thomas should consult an attorney. In approximately August 2011, Thomas asked Alice to bring him all of his trust documents, then asked Walter to make and keep a copy of them. Because Thomas was

confined to medical facilities, he asked Walter and Foster to help find an attorney to amend the 2004 Trust; neither, however, immediately acted on that request. Thomas mentioned having doubts about the validity of his marriage and gave Walter money to hire an investigator to look into whether Alice was still married at the time of their April 2001 marriage ceremony.

¶8          About a week after he first asked Walter to contact an attorney, Thomas became upset when Walter had not yet done so. Walter then began looking for an attorney in earnest. Rather than contacting the attorney who drafted the trust and amendments, Walter contacted attorneys in Prescott. On September 21, 2011, Walter contacted attorney Eric Chester. Walter told Chester that Thomas was concerned about his marriage, wanted an annulment and wanted to disinherit Alice. Chester agreed to contact Thomas. That same day, Thomas received word from the investigator that Alice was still married to another man when she and Thomas performed their marriage ceremony in April 2001.

¶9          During September 2011, Thomas' health deteriorated. On the morning of September 22, 2011, Thomas participated in an interdisciplinary meeting with his caregivers and holders of his medical powers of attorney. By that time, Thomas was in the hospital. Walter, Alice and Thomas met with five or six of Thomas' medical providers and decided to end Thomas' treatment and provide only comfort care going forward. Immediately after that meeting, Walter told Jill Logan, the ethics director of the facility, that Thomas wanted to consult with an attorney. Logan consulted with the facility's director of risk and quality, met with Thomas to verify his desire as well as evaluate his capacity to receive visitors based on his understanding of his circumstances, and found no reason to question his capacity.

¶10         Walter arranged a meeting between Thomas and Chester, for 2:00 p.m. on September 22, 2011. Thomas agreed to have Chester prepare a new will and trust amendment and requested the meeting to be at that time because he did not want Alice to be there. The next day, Chester called Walter and asked Walter to arrange for a person who knew Thomas to go to the hospital to identify Thomas, stating Thomas did not have any identification with him in the hospital. Although Walter drove Foster to the hospital to allow Foster to identify Thomas, Walter did not go inside.

¶11         Foster, who met with Thomas that day, indicated Thomas was alert and recognized him when he arrived. On September 23, 2011, Foster signed a document for Chester that identified Thomas as Tom Koma. Foster

stayed while Thomas and two witnesses signed a sixth amendment to the trust (the 2011 Amendment) as well as a last will and testament (the 2011 Will). Collectively, the 2011 Will and the 2011 Amendment revoked all of Thomas' prior wills, left Thomas' estate to Potter's House, disinherited Alice and named Walter as Thomas' personal representative.

¶12         Thomas died the next day, September 24, 2011, at approximately 8:35 a.m. Alice first learned of the 2011 Amendment and the 2011 Will two days later at the funeral home, and she immediately sought legal counsel.

¶13         On October 14, 2011, Alice filed a petition for formal probate of the 2004 Will and the 2004 Trust. The petition alleged that the 2011 Will and the 2011 Amendment were presumptively invalid because they were the result of undue influence by Potter's House. Chester, who had drafted the 2011 Will and the 2011 Amendment, appeared as attorney of record for Walter, Thomas' personal representative, in December 2011. Walter objected to Alice's petition, arguing that her purported marriage to Thomas was void because she was married when the April 2001 marriage ceremony was held, and he filed a cross-petition for formal probate of the 2011 Will.

¶14         In early April 2012, Alice deposed Chester to obtain testimony regarding the creation of the 2011 Will and the 2011 Amendment, but Chester refused to answer various questions, invoking the attorney-client privilege based on his provision of legal services to Thomas. Alice moved to disqualify Chester from serving as counsel for Walter, Thomas' personal representative, arguing Chester was a material witness and the attorney-client privilege should not apply. In May 2012, the superior court denied the motion to disqualify without prejudice, allowing the parties to undertake discovery. In April 2013, the court denied a renewed motion to disqualify Chester, finding "his testimony is not needed to complete the story;" that "Chester is not in a position to fill in the [factual] pieces that Alice . . . claims are missing" and that Alice had not established that the testimony sought could only be obtained from Chester.

¶15         Alice filed a timely written jury trial demand on the issues of undue influence and lack of testamentary capacity. When no objection was filed, the superior court originally set the matter for a jury trial. After a change of judge overseeing the case, however, the court set the matter for a bench trial. Alice then filed another written jury trial demand, which Walter opposed. After hearing argument, the court found Alice had no right to a jury trial.

**¶16** The court held a five-day bench trial in May 2014. Several witnesses testified regarding Thomas' mental state and to whether he was susceptible to undue influence. Terese Sitiko, Chester's employee who acted as witness for the 2011 Will and the 2011 Amendment, testified that when the documents were signed, Thomas' eyes were clear; he was alert; he greeted his friends by name and he responded intelligently to questions. Dr. Timothy Missey, who provided medical care for Thomas, testified that in the days leading up to his death, Thomas was understandably scared but understood his condition and did not lack mental capacity. Jill Logan, the ethics director at the facility caring for Thomas, found no reason to question his capacity, testifying Thomas was alert and responsive and made helpful contributions to the conversation at the interdisciplinary meeting held the day before the documents were signed.

**¶17** After receiving evidence and hearing arguments, in a ruling from the bench issued May 13, 2014, the superior court found the 2011 Will and the 2011 Amendment were valid and appointed Walter as Thomas' personal representative. Alice moved for a new trial, arguing Walter failed to make required disclosures under Arizona Rule of Civil Procedure 26.1 (2016).[2] The court denied the motion, finding Alice failed to show how the claimed disclosure failures had prejudiced her and, alternatively, the facts she claimed were not properly disclosed were not relevant to the court's decision.

**¶18** Alice timely appealed the May 13, 2014 bench ruling. This court has jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes sections 12-2101(A)(1) and -120.21(A)(1).

## DISCUSSION

**¶19** Alice argues the superior court erred by: (1) holding a bench (rather than a jury) trial after the matter was reassigned to a different judge; (2) finding Thomas had testamentary capacity to execute the 2011 Will and the 2011 Amendment; (3) ruling the 2011 Will and the 2011 Amendment were not presumed to be the product of undue influence pursuant to A.R.S. § 14-2712(E)(1); (4) permitting Chester to represent Walter as personal representative; and (5) denying her post-trial motions based on Walter's alleged failure to properly disclose information.

---

[2] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

## I.  The Superior Court Did Not Err By Denying A Jury Trial.

**¶20**      Alice argues her "right to a jury trial was secured" when, after Walter failed to object to her original jury demand, the court set the matter for a jury trial. She argues that because of that decision, the subsequent decision by a different judge to hold a bench trial constitutes an improper horizontal appeal, and the new judge lacked the authority to reconsider the issue absent the presentation of new facts and circumstances.

**¶21**      "A party seeks a 'horizontal appeal' when it requests a second trial judge to reconsider the decision of the first trial judge in the same matter, even though no new circumstances have arisen in the interim and no other reason justifies reconsideration." *Powell–Cerkoney v. TCR–Mont. Ranch Joint Venture, II,* 176 Ariz. 275, 278-79 (App. 1993) (citation omitted). Although horizontal appeals have been criticized on various grounds, in this context, the court's first ruling did not create a jurisdictional or substantive limitation on the court's power to revisit the ruling to get to the correct result. *See id.* (noting superior court has substantial discretion to reconsider an earlier decision and "must not afford this procedural doctrine undue emphasis."). Alice has not argued on appeal that she has a constitutional or statutory right to a jury trial, and therefore has not shown the superior court reached the incorrect legal decision. Nor has she shown how the superior court lacked the authority to reconsider the jury trial issue or abused its discretion in doing so. Accordingly, her argument fails.

## II.  The Superior Court Did Not Err By Finding Thomas Had Capacity.

**¶22**      Alice argues the superior court erred by finding, at the end of trial, that Thomas had capacity to sign the 2011 Will and the 2011 Amendment. "It is a rebuttable presumption that a person who executes a governing instrument is presumed to have capacity to execute the governing instrument and to have done so free from undue influence and duress." A.R.S. § 14-2712(B); *see also* A.R.S. § 14-1201(22) (defining "governing instrument" as including a will or trust). At oral argument, Alice argued the superior court erred by placing on her the burden to show lack of testamentary capacity, citing *In re Vermeersch's Estate*, 109 Ariz. 125 (1973). As the party contesting the validity of the 2011 Will and the 2011 Amendment, however, Alice had the burden to rebut this presumption. *See id.* at 128.

**¶23**      "To successfully challenge the validity of the will for lack of testamentary capacity, the burden was on the contestant to prove a lack of one of the following elements: (a) the ability to know the nature and extent

of one's property, (b) the ability to know the natural objects of one's bounty, and (c) the ability to understand the nature of the testamentary act." *Id.* (citations omitted); *accord Matter of Estate of Killen*, 188 Ariz. 562, 565 (App. 1996) (similar).[3] Testamentary capacity is determined at the time the documents are signed. *See In re O'Connor's Estate*, 74 Ariz. 248, 257-58 (1952). Factual findings regarding testamentary capacity will be reversed only if clearly erroneous. *See In re Thomas' Estate*, 105 Ariz. 186, 189 (1969); *see also In re Estate of Pouser*, 193 Ariz. 574, 579 (1999) (noting superior court's decision regarding testamentary capacity will be affirmed if supported by substantial evidence).

¶24 Alice argues the superior court abused its discretion in rejecting, after considering the evidence, her challenges to the 2011 Will and the 2011 Amendment. More specifically, Alice argues the court should have concluded that Thomas failed to understand his marital status when he executed those documents. This argument relies on the fact that the documents refer to Thomas as a married man and refer to Alice as his wife, even though he had learned that his marriage to her was not valid. But the superior court noted that fact, and still rejected Alice's challenges, noting it had "placed little weight" on the fact that Alice was referred to as Thomas' wife in the documents. Moreover, the same documents that list Alice as Thomas' wife completely disinherited her. Accordingly, the documents themselves did not compel the superior court to conclude that Thomas was incapable of knowing the natural objects of his bounty.

¶25 The superior court received other evidence of Thomas' capacity. Thomas was alert and coherent on September 21, 2011 –- two days before he signed the 2011 Will and the 2011 Amendment -- when he received a report from a private investigator confirming Alice was still married when she purported to marry Thomas. On September 22, 2011 –- the day before Thomas signed the documents -- Dr. Missey and Jill Logan determined that Thomas was alert, responsive and capable of meeting with an attorney. Then, on September 23, 2011, Thomas greeted Foster by name just before signing the documents, further indicating he understood his personal relationships. On this record, Alice has not shown an abuse of discretion.

¶26 Alice argues the superior court erred by giving more weight to the testimony of Dr. Missey and Jill Logan than to that of Foster and

---

[3] The parties do not argue that the capacity analysis applicable to the 2011 Will and the 2011 Amendment should differ and, accordingly, the court uses the same analysis for both documents.

Sitiko, who were present when the documents were executed. Weighing and assessing evidence, however, is for the finder of fact at trial, not this court on appeal. *See Pouser*, 193 Ariz. at 579. And although Dr. Missey and Jill Logan were not present at the signing, their testimony is relevant to Thomas' mental state at the time the documents were signed. *See In re O'Connor's Estate*, 74 Ariz. at 257-58. Because there was substantial evidence to support a finding that Thomas had capacity on September 23, 2011, and because Alice did not present evidence sufficient to overcome the presumption of validity, the superior court did not abuse its discretion in concluding that Thomas had testamentary capacity when signing the 2011 Will and the 2011 Amendment.

### III. The Superior Court Did Not Err By Finding Walter Was Not A Principal Beneficiary, And Consequently, A Statutory Presumption of Undue Influence Did Not Apply.

¶27 Alice claims the superior court erred by finding, as a matter of law, that a statutory presumption of undue influence by Walter did not apply to the facts presented. By statute, a will or trust "is presumed to be the product of undue influence if . . . [a] person who had a confidential relationship to the creator of the governing instrument was active in procuring its creation and execution and is a principal beneficiary of the governing instrument." A.R.S. § 14-2712(E)(1). Unless the facts are undisputed and one party is entitled to judgment as a matter of law, whether a person is a primary beneficiary is a question of fact "to be determined by the totality of the circumstances." A.R.S. § 14-2712(G). This court will uphold the superior court's findings of fact if "substantial evidence exists to support the trial court's action." *Pouser*, 193 Ariz. at 579.

¶28 Walter was not named a beneficiary in the 2011 Will or the 2011 Amendment. Alice, however, argues that Walter was acting as an agent of Potter's House, which was a named beneficiary. Any such agency relationship, even if supported factually, would not make Walter (as opposed to Potter's House) a principal beneficiary under A.R.S. § 14-2712(E)(1). It remains the case, as noted by the superior court, that Alice has not provided any authority construing A.R.S. § 14-2712(E)(1) that "suggest[s] that a church member, employee or representative is a principal beneficiary when a church is named as the beneficiary in a will or trust." Alice has not shown that the superior court erred in finding that Walter was not a principal beneficiary under the 2011 Will or the 2011 Amendment.

¶29 Similarly, Alice has not shown the superior court erred by rejecting her claim that Walter should be treated as a principal beneficiary

based on agency concepts. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). The evidence offered at trial supports the superior court's conclusion that Walter was not acting as an agent of Potter's House during the relevant time period leading up to Thomas signing the 2011 Will and the 2011 Amendment.

¶30 Although Walter had been a pastor and employee at Potter's House in the past, he was not serving in either capacity during the time he knew Thomas. Alice argues that, for a principal-agent relationship to exist, it is "sufficient that the Potter's House encouraged [Walter] to pursue" the 2011 Will and the 2011 Amendment. Alice does not cite any legal authority for that proposition, however, and she does not cite to any record evidence that Potter's House encouraged Walter to pursue the 2011 Will and the 2011 Amendment. Although Alice points to various pastors accompanying Walter to visit Thomas leading up to September 24, 2011, there is no evidence that Thomas discussed his estate plans during those visits or that Potter's House encouraged Walter to assist in procuring the 2011 Will or the 2011 Amendment. Indeed, there is no evidence that any Potter's House official knew of Walter's actions regarding Thomas' estate plans, much less that Potter's House was controlling or directing Walter's actions. Given this evidentiary void, Alice has not shown the superior court, as finder of fact, erred by failing to find that Walter was an agent for Potter's House at any relevant time leading up to the execution of the 2011 Will and the 2011 Amendment. For this additional reason, the superior court did not err by concluding the presumption set forth in A.R.S. § 14-2712(E)(1) did not apply.

## IV. The Superior Court Did Not Abuse Its Discretion By Finding Alice Had Not Shown Undue Influence.

¶31 Absent the presumption of undue influence under A.R.S. § 14-2712(E), a will or trust is presumed to be created free of undue influence or duress. *See* A.R.S. § 14-2712(B). As applicable here, to successfully challenge the validity of the 2011 Will and the 2011 Amendment, Alice bore the burden to show the invalidity of the documents by a preponderance of the evidence, A.R.S. § 14-2712(D), based on the following factors:

> [w]hether the alleged influencer has made fraudulent representations to the [testator]; whether the execution of the will was the

product of hasty action; whether the execution of the will was concealed from others; whether the person benefited by the will was active in securing its drafting and execution; whether the will as drawn was consistent or inconsistent with prior declarations and plannings of the [testator]; whether the will was reasonable rather than unnatural in view of the [testator's] circumstances, attitudes, and family; whether the [testator] was a person susceptible to undue influence; and whether the [testator] and the beneficiary have been in a confidential relationship.

*In re McCauley's Estate*, 101 Ariz. 8, 10-11 (1966) (citations omitted). "Whether undue influence has been exerted to bring about the making of a particular will is a question of fact." *Id.* at 10. On appeal, the evidence is not reweighed but, instead, reviewed to determine whether there is substantial evidence to support the superior court's decision. *See Pouser*, 193 Ariz. at 579.

**¶32**        Alice argues the superior court "abused its discretion when it dismissed several of the *McCauley* factors from its balancing test." She argues that because the court found several *McCauley* factors weighed in favor of undue influence, yet ultimately rejected her undue influence claim, the court "erred in its weighing of the *McCauley* factors." On this record, however, Alice has not shown the superior court abused its discretion by weighing the *McCauley* factors, as the finder of fact, in ultimately rejecting her challenge to the 2011 Will and the 2011 Amendment.

**¶33**        The superior court properly applied *McCauley*, prefacing its analysis by stating that the undue influence issue was "a very much closer call" than the question of Thomas' capacity, and adding "I do believe that the Potter's House and . . . Walter did influence his decision on what – where to leave his property, but I don't find that it was undue influence." The superior court then discussed each *McCauley* factor, noting that some of the factors supported Alice's claim and some did not, and concluded: "[b]ased on the totality of all of those factors, I do not find that there was undue influence concerning the execution of the 2011 estate documents." Although Alice argues the superior court should have applied the *McCauley* factors to reach a different conclusion, the record supports the findings, and her argument is an invitation to reweigh the evidence, which this court will not do. *See Pouser*, 193 Ariz. at 579.

**¶34** Alice did not cite to any fraudulent statements that induced the creation of the 2011 documents, and the superior court thus found that any alleged fraudulent statements were immaterial. Although noting the signing of the documents "was the product of hasty action," the superior court noted "that was the result of necessity, and it's really not disputed too much by" Alice. Although the superior court noted the documents were concealed from Alice and that Walter and Thomas had a confidential relationship, Potter's House did not directly procure the creation of the documents. And as discussed above, the record does not support the finding that Walter acted as an agent for Potter's House.

**¶35** Although the changes reflected in the 2011 Will and the 2011 Amendment were inconsistent with the 2004 Will and prior trust amendments, the superior court found that the changes were "reasonable rather than unnatural . . . based on my view of the evidence." More specifically, the changes were reasonable in light of Thomas' attitude and family situation, particularly given Thomas' statements to friends over several months that he wanted to leave money to Potter's House. Moreover, the evidence indicated Thomas was unhappy in his relationship with Alice and had recently learned his marriage was likely invalid. Finally, witnesses testified Thomas was willful and headstrong, not the type of person to be easily swayed, causing the superior court to conclude "that he was a strong-willed individual and . . . did things the way he wanted them done, so I don't find that he was susceptible to undue influence." Because there was substantial evidence supporting this analysis by the superior court, Alice has not established an abuse of discretion. *See Pouser*, 193 Ariz. at 579.

## V.     The Superior Court Did Not Err By Allowing Chester to Represent Walter As Personal Representative.

**¶36** Alice argues the superior court erred by denying her motion to disqualify Chester and by allowing him to represent Walter as personal representative because the "Arizona Rules of Professional Conduct prohibit[] an attorney who is 'a necessary witness' from being an advocate in the same matter." *See* Ariz. R. Sup. Ct. 42, ER 3.7(a). Alice contends Chester was a necessary witness because he was the only person who could testify as to whether he met with Thomas individually, and to Thomas' mental state and other circumstances if such a meeting took place.

**¶37** As noted by the superior court, particularly given that a party has a right to counsel of his or her choice, a motion to disqualify opposing counsel should not be granted for mere strategic or tactical reasons. *See Security General Life Ins. Co. v. Superior Court*, 149 Ariz. 332, 335 (1986); *accord*

*Amparano v. ASARCO*, Inc., 208 Ariz. 370, 376 ¶ 22 (App. 2004) (noting Ethical Rules "are not designed to be used as a means to disqualify counsel"). Moreover, there is no dispute that any testimony sought from Chester would be subject to the attorney-client privilege, which did not terminate upon Thomas' death, as well as Chester's duty of confidentiality. *See* A.R.S. 12-2234(A); *State v. Macumber*, 112 Ariz. 569, 571 (1976) (noting attorney-client privilege does not terminate upon death of client); Ariz. R. Sup. Ct. 42, E.R. 1.6 (setting forth confidentiality obligation). Alice has not shown what testimony she believes that Chester could have provided consistent with his obligations of confidentiality. On this basis alone, Alice has not shown the superior court abused its discretion in refusing to disqualify Chester as a necessary witness. *See Amparano*, 208 Ariz. at 376 ¶ 22.

**¶38**      Similarly, Alice has not shown the superior court erred by analyzing whether any testimony that might be obtained from Chester was necessary and could only be obtained from him. The documents Chester prepared that Thomas signed were consistent with the intentions Thomas related to other witnesses. Because Alice has not alleged any conspiracy or malfeasance by Chester, there is no reason to believe any desires expressed in a hypothetical private meeting would differ from those related at other meetings. Moreover, to the extent that Alice sought testimony from Chester about Thomas' capacity on September 23, 2011, several other witnesses testified to Thomas' capacity both in the days leading up to, and at the execution of, the 2011 documents. Indeed, the superior court concluded that information Alice had provided "establishes that she has obtained the information from other sources and that there are other witnesses besides . . . Chester who can provide the other information she seeks." For this reason as well, Alice has not shown the superior court abused its discretion by refusing to disqualify Chester as a necessary witness. *See Amparano*, 208 Ariz. at 377 ¶ 22.

## VI.    The Superior Court Did Not Err By Not Granting Alice A New Trial.

**¶39**      Claiming Walter failed to make proper required disclosures, Alice filed a timely post-trial motion, seeking to vacate the superior court's decision and requesting a new trial based on "[m]isconduct of the . . . prevailing party." Ariz. R. Civ. P. 59(a)(2).[4] A new trial is proper, however,

---

[4] Alice also unsuccessfully sought relief under Rule 60(c)(3) for these same alleged disclosure failures. Alice did not, however, properly appeal from

only where it appears probable the misconduct actually affected the judgment. *Maxwell v. Aetna Life Ins. Co.*, 143 Ariz. 205, 215 (App. 1984) (discussing motion for new trial following jury verdict). The superior court is in the best position to determine if conduct influenced the judgment. *Ring v. Taylor*, 141 Ariz. 56, 61 (App. 1984). This court will reverse a ruling on a motion for new trial "only if it reflects a manifest abuse of discretion given the record and circumstances of the case." *Styles v. Ceranski*, 185 Ariz. 448, 450 (App. 1996).

**¶40**        Alice's arguments regarding her request for a new trial are unavailing. The superior court concluded she had "failed to prove that [Chester's] disclosure violations substantially interfered with her ability to fully and fairly prepare for trial," meaning the court found no basis for a new trial. With respect to disclosures suggesting a witness might have bias, the court noted it "initially found this late disclosure disturbing," but added that it gave no weight to the witness' testimony, relying instead on testimony from medical professionals. Although Alice alleged seven additional areas of non-disclosure, the superior court noted the information was eventually discovered by other means at or shortly before trial. The court further noted that Alice did not explain how that information was relevant, adding "[m]ore importantly though, the Court found [the information] did not affect the Court's final decision in the case." All of these findings are supported by the record, and Alice does not provide any arguments for how the failure to disclose these other items may have affected the judgment. Accordingly, and although this court does not condone any failure to make appropriate and timely disclosure as required by Rule 26.1, Alice has not shown the superior court abused its discretion by denying her motion for new trial.

---

the superior court's denial of relief under Rule 60(c)(3), as determined by this court's January 6, 2015 order and the time for her to do so has long since passed. As a result, the Rule 60(c)(3) ruling is now final and binding, and this court lacks jurisdiction to further consider that ruling.

**CONCLUSION**

**¶41** Because Alice has shown no error, the superior court's decision is affirmed.



Ruth A. Willingham · Clerk of the Court
FILED: ama